ATLANTIC & PACIFIC TELEGRAPH COMPANY *v.* UNION PACIFIC RAILWAY COMPANY and another.

*(Circuit Court, D. Nebraska.* ——, 1880.)

CORPORATION—CONTRACT—ULTRA VIRES—INJUNCTION.—Although a contract may have been *ultra vires*, a court of equity will restrain a corporation from recovering possession of property which has passed thereunder, without due process of law and a return of the consideration paid.

Motion for injunction.

McCRARY, J. By act of congress, approved July 1, 1862, and acts amendatory thereof, the Union Pacific Railroad Company was created a corporation with power to "lay out, locate, construct, furnish, maintain and enjoy a continuous railroad and telegraph, with appurtenances," from the Missouri river, through Nebraska and Wyoming, to a junction with the Cen-

tral Pacific Railroad in Utah. Under this authority the said railroad company built, and early in 1869 completed, its railroad and telegraph over said route. The plaintiff is a corporation organized under the laws of the state of New York.

On the first day of September, 1869, the plaintiff and said Union Pacific Railroad Company entered into a contract, whereby, among other things, the railroad company agreed to demise and lease to plaintiff "all its telegraph lines, wires, poles, instruments, offices, and all other property by it possessed, appertaining to the business of telegraphing, for the purpose of sending messages and doing a general telegraphic business; to have and to hold for and during the whole term of the charter of the party of the first part [the railroad company] and any renewals thereof, subject to the rights of the United States as set forth in the charter of the railroad company, and on the condition that the plaintiff would faithfully and fully perform all the duties imposed or to be imposed upon the railroad company by its charter or by the laws of the United States."

On the twentieth day of December, 1871, a supplemental agreement was entered into between said parties, by which certain changes were made in the original contract. Among other things, it was provided in said contracts that the railroad company should receive from plaintiff, in consideration for the same, 17,800 shares of the capital stock of the plaintiff corporation, (the Atlantic & Pacific Telegraph Company,) which stock the railroad company received and applied to its own use. Said contracts were duly performed on both sides until the twenty-seventh day of February last, when the railroad company assumed, of its own motion, to rescind the same, and to resume possession and control of the property; for which purpose its agents cut the wires running from the general offices of plaintiff, for commercial business, at Omaha, and severed said offices from the main line. It is charged in the bill that this was done for the purpose of giving the business of said line at Omaha, and all the advantages thereof, to the defendant, the American Union Telegraph Company,

a competitor and rival of plaintiff in the business of telegraphing.

The Union Pacific Railroad Company, by consolidation with another company, has become the Union Pacific Railway Company, by which name it is sued.

The prayer of the bill is, among other things, for an injunction to restrain the defendants from disregarding the two contracts above mentioned, and from interfering with the property covered thereby, except as in said contracts provided, and from preventing the plaintiff from reconnecting the wires so as to restore them to their original condition before the same were cut. On the first of March it was ordered that the application for injunction be heard before me, at chambers at St. Louis, on the sixth of April, 1880, and in the meantime a preliminary injunction was allowed.

The defendants have answered fully, and numerous affidavits have been filed. Upon the record thus presented counsel have been fully heard, both orally and by printed briefs.

The Union Pacific Railway Company, defendants, admit the cutting of the wires as charged, as well as their purpose to disregard the contracts, and retake the telegraph lines and property, and in justification allege that said contracts were beyond the power of the company to make, contrary to public policy, and in violation of the acts of congress chartering the Union Pacific Railroad Company, and that they are therefore void. The question of the validity of these contracts is the first to be considered.

1. The rules by which this question is to be determined are now well settled, at least in the federal courts. They have been clearly stated by the supreme court in the recent case of *Thomas et al.* v. *The West Jersey R. Co.* (not yet reported.) From the opinion in that case, delivered by Mr. Justice Miller, I make the following extracts, as laying down the law by which I must be guided:

"We take the general doctrine to be in this country, though there may be exceptional cases and some authorities to the contrary, that the powers of a corporation organized under legislative statutes are such and such only as those statutes

confer. "Conceding the rule applicable to all statutes, that what is fairly implied is as much granted as what is expressed, it remains that the charter of a corporation is the measure of its powers, and that the enumeration of those powers implies the exclusion of all others.

*     *     *     *     *     *     *

"There is another principle of equal importance, and equally conclusive against the validity of this contract, which, if not coming exactly within the doctrine of *ultra vires*, as we have just discussed it, shows very clearly that the railroad company was without the power to make such a contract.

"That principle is that where a corporation, like a railroad company, has granted to it by charter a franchise intended in a large measure to be exercised for the public good, the due performance of those functions being the consideration of the public grant, any contract which disables the corporation from performing those functions—which undertakes, without the consent of the state, to transfer to others the rights and powers conferred by the charter, and to relieve the grantees of the burden which it imposes—is a violation of the contract with the state, and is void as against public policy. This doctrine is asserted with remarkable clearness in the opinion of this court, delivered by Mr. Justice Campbell, in the case of *The York & Maryland Line Railroad Co.* v. *Winans*, 17 Howard, 30. The corporation in that case was chartered to build and maintain a railroad in Pennsylvania by the legislature of that state. The stock in it was taken by a Maryland corporation, called the Baltimore & Susquehanna Railroad Company, and the entire management of the road was committed to the Maryland company, which appointed all the officers and agents upon it, and furnished the rolling-stock.

"In reference to this state of things, and its effect upon the liability of the Pennsylvania corporation for infringing a patent of the defendant in error Winans, this court said: 'This conclusion [argument] implies that the duties imposed upon the plaintiff [in error] by the charter are fulfilled by the construction of the road, and that, by alienating its right to use and its powers of control and supervision, it may avoid further

responsibility. But these acts involve an overturn of the relations which the charter has arranged between the legislature and the community. Important franchises were conferred upon the corporation to enable it to provide facilities for communication and intercourse required for public convenience. Corporate management and control over these were prescribed, and corporate responsibility for their insufficiency provided as a remuneration for their grant. The corporation cannot absolve itself from the performance of its obligations without the consent of the legislature. *Beman* v. *Rufford*, 1 Simon N. S. 550; *Winch* v. *B. & L. R. Co.* 13 Law and Equity, 506.'

"And in the case of *Black* v. *Delaware & Raritan Canal Co.* 7 C. E. Green, N. J. Eq. 399, Chancellor Zabriskie says: 'It may be considered as settled that a corporation cannot lease or alienate any franchise, or any property necessary to perform its obligations and duties to the state, without legislative authority.' For this he cites some 10 or 12 decided cases in England and this country."

   ✻     ✻     ✻     ✻     ✻     ✻     ✻

The case in which these propositions of law was announced was this: A New Jersey railroad corporation, without express authority, undertook to lease to another company for 20 years its railroad, with all its appurtenances and franchises, including the right to do the business of a railroad and collect the proper tolls. The contract or lease was confirmed by a vote of the stockholders. The lessor was authorized to cancel the lease upon giving three months' notice, but in that event was to be liable to pay the damages incurred by the other party by reason of such action. Under this provision the railroad company ended the contract, and resumed possession of the leased road. The suit was by the lessee for the damages provided for, and it was held that no recovery could be had because the contract was *ultra vires*. It remains to apply these principles to the case in hand.

2. It is certain that the contracts in question amounted to a lease, or alienation, by the Union Pacific Railroad Company, of property which was necessary to the performance

of its obligations and duties to the government, and to the public.

In my judgment the act of July 1, 1862, and its amendments, must be construed as chartering the Union Pacific Railroad Company, and devolving upon it, individually and personally, the power and duty of constructing, operating and maintaining a line of telegraph, as well as a railroad. This is made manifest by the consideration that the government endowed the corporation with large grants of land and bonds, to aid in the construction of these lines, and impressed upon the company the duty of reimbursing the government from the earnings of the road and telegraph line. Section 6, act of 1862. It is also clear from the language of the first section of said act, which empowers the corporation "to lay out, locate, construct, furnish, *maintain and enjoy* a continuous railroad and telegraph, with the appurtenances," that the power conferred was personal, and carried with it a duty and an obligation which could not be transferred.

The very same language which authorizes the construction and operation of the telegraph line also authorizes the construction and operation of the railroad, and the property in the one is as necessary to the performance of the public duties of the corporation as that in the other. The charter of the company, with the amendments, considered as a whole, was manifestly intended to create a corporation which should be personally amenable to the government, in the exercise of the powers conferred, and which should in *quasi* public capacity perform the duties imposed, and render an account of its earnings.

The purpose was not to authorize the construction of a line either of railroad or telegraph to be thereafter sold, leased or transferred to other parties, leaving the government to the chances of securing from or through the lessee or vendee its proportion of the earnings. This is made still more clear by the provisions of the act of June 20, 1874, amending the charter, which imposes upon the company and its officers and agents penalties for a failure to operate or use said railroad or telegraph, *so far as the public and the government are con-*

*cerned,* as one continuous line, and which gives a right of action to any party aggrieved, "in case of failure or refusal of the Union Pacific Railroad Company, or either of said branches, to comply with this act or the acts to which this is amendatory."

I conclude that the charter of the Union Pacific Railroad Company devolved upon it the duty of constructing, operating and maintaining a line of telegraph for commercial and other purposes, and that this is in its nature a public duty. I am further of the opinion that, by the provisions of the contract of September 1, 1869, and of December 20, 1871, the railroad company undertook to lease or alienate property which was necessary to the performance of this duty. The consideration for these contracts is declared to be "the demise of their telegraph lines, property and good-will, and of the rights and privileges, in the manner hereinafter specified," etc., and the property demised by the railroad company is all its telegraphic lines, wires, poles, instruments, offices, and all other property by it possessed, appertaining to the business of telegraphing, for the purpose of sending messages and doing a general telegraph business. The lessee was to hold during the whole term of the charter of the railroad company and any renewal thereof. There is inserted a stipulation that the lessee shall perform all the duties imposed or that may be imposed upon the railroad company by their charter or by the laws of the United States. But, as already intimated, I do not think this latter clause makes the contract good. The railroad company was not at liberty to transfer to others those important duties and trusts which it, for a large consideration, and for a great public purpose, had undertaken to perform. It certainly could not divest itself of these powers and duties, and devolve them upon the plaintiff, without express authority from congress.

3. But if the contracts in question are not *ultra vires,* by reason of the transfer of property necessary to the performance by the railroad company of its public duties, they are so because they attempt to transfer certain franchises of the said company. The right to operate a telegraph line, and to fix

and to collect tolls for the use of the same, is, to say the least, the most valuable part of the franchise conferred by congress upon the railroad company, as a telegraph company. This right is alienated by a clear and unequivocal assignment or transfer from the railroad company to the plaintiff. Without discussing other features of the contracts I am compelled to hold that this feature is alone sufficient to render them in excess of the corporate power of the company.

4. This brings me to the question whether the railroad company can be permitted to rescind the contract, and on its own motion to take possession of the lines, offices and property, without first returning the consideration received therefor from the plaintiff. As already stated, the railroad company received from the plaintiff, in payment for the property and rights agreed to be transferred by said contracts, 17,800 shares of the capital stock of the corporation plaintiff. There is a dispute as to the value of the stock, but I believe it is not placed by any one of the deponents at less than $150,000, while some of them place it at a much higher sum.

No case has been cited in argument, nor have I been able to find one, which holds that a court of equity, having jurisdiction of the parties to and the subject-matter of an illegal contract, should require one of such parties to give up what he has received under it, without requiring the other to do the same thing. Many cases hold that a corporation which has made a contract *ultra vires*, which has not been fully performed, is not estopped from pleading its own want of power when sued upon such contract; but that doctrine does not apply to a case where a party comes into a court of equity, and, while retaining all that he has received upon such a contract, asks to be permitted to retake what he has parted with under it. I take it there is nothing in the law, as there is certainly nothing in the principles of equity, to estop the court from saying that the obligation to return the property transferred under these contracts is mutual, and shall not be enforced against one of the parties without being at the same time enforced against the other. As the parties and the subject-matter are now before the court, it is the duty of the

court, as far as possible, to place them in *statu quo.* It has been held that even in cases at common law a contract *ultra vires,* made between a corporation and another person, and under which the corporation has received value, which it retains, will be so far enforced as to estop the corporation from refusing payment on the ground of its own want of power. *Bradley* v. *Bullard,* 55 Ill. 417.

And in the case of *Thomas* v. *R. Co.* (supreme court U. S.) already quoted from at length, Mr. Justice Miller, upon this point, says: "There can be no question that, in many instances, where an invalid contract, which the party to it might have avoided or refused to perform, has been fully performed on both sides, whereby money has been paid or property changed hands, the courts have refused to sustain an action for the recovery of the property or the money so transferred. And in regard to corporations the rule has been well laid down by Chief Justice Comstock, in *Parish* v. *Wheeler,* 22 New York, 404, that the executed dealings of corporations must be allowed to stand for and against both parties when the plainest rules of good faith require it. But what is sought in the case before us is the enforcement of the unexecuted part of this agreement. So far as it has been executed, namely, the four or five years of action under it, the accounts have been adjusted, and each party has received what he was entitled to by its terms."

The present case, like the New Jersey case in which these remarks were made, is one on which the contract has been executed in part, but it differs from that case in one important particular. In the New Jersey case the court say that, "so far as it [the contract in question] has been executed, namely, the four or five years of action under it, the accounts have been adjusted and *each party has received what he was entitled to by its terms.*"

If that case had been in equity, and it had appeared that the railroad company had received in advance the full consideration for the whole term of the lease, which it retained, while asking to be relieved from the contract, I have no doubt

the court would have said : "You must come into this tribunal with clean hands; you must do equity before you can seek the aid of a court of conscience."

The contention of the railroad company is that it should be permitted to take possession of the property in controversy without process or legal proceedings. While I am clear that the contracts under which the property is held by plaintiff are *ultra vires*, there is a dispute upon that subject, and such a dispute as in my judgment cannot be determined by the railroad company of its own motion.

The right of rescission does not justify the railroad company in taking possession except by lawful means. The plaintiff has a right to be heard upon issue joined in a proper proceeding before being ejected. The present question is not whether the contracts should be rescinded and the property restored to the railroad company, but whether this should be done by the railroad company upon its own motion, and in a way to deprive the plaintiff not only of a hearing in the regular course of this court, but also deprive it of the right of appeal.

It is one thing for me to hold that the contracts are in my judgment *ultra vires*, and quite another to say to the railroad company, "You may turn the plaintiff out and take possession without giving it a day in court."

An injunction will often be granted to restrain a party from deciding for himself a question involving controverted rights, and to compel him to resort to the courts, and this without regard to the absolute merits of the controversy. It is enough that there is a controversy to justify a court of equity in directing that it be settled by legal proceedings. *Eckelkamp* v. *Schroeder*, 45 Mo. 505; *Varick* v. *New York*, 4 John. Ch. 53; *Dudley* v. *Trustees*, 12 B. Monroe, 610; *Farmers* v. *Reno*, 53 Pa. St. 224; *Sunsing* v. *Steamboat Co.* 7 John. Ch. 162.

The principle settled by these and many other cases is that a party who is in actual possession of property, claiming under color of title, is not to be ousted, except by the means provided by law, and such a possession the court will protect by injunction from disturbance by any other means. For this

reason, therefore, as well as upon the grounds above stated, I am clearly of the opinion that the railway company cannot be permitted to oust the plaintiff from possession without process.

The injunction, heretofore granted, will be so far modified as to make it clear that the railroad company is at liberty to institute legal proceedings, either by cross-bill in this case or otherwise, to cancel and set aside the said contracts upon a return of the consideration, and to settle and adjust, upon principles of equity, the accounts between the parties.