WESTERN UNION TELEGRAPH CO. *v.* UNION PACIFIC RAILWAY
Co. and others.

(*Circuit Court, D. Kansas.* October 1, 1880.)

1. "PACIFIC RAILROAD ACTS"—OBLIGATION TO CONSTRUCT AND OPERATE
A LINE OF TELEGRAPH.—On the face of the acts of congress of 1862
and 1864, called the " Pacific Railroad Acts," the obligation of the
Union Pacific Railroad Company and its branches, to build and oper-
ate for the public a telegraph line along its right of way, was an ob-
ligation which they cannot abandon.

2. ACT OF JULY 2, 1864.—By the provisions of the fourth section of the
act of July 2, 1864, entitled " An act for increasing the facilities of
telegraph communication between the Atlantic and Pacific states,
and the territory of Idaho," the Union Pacific Railroad Company and
its branches were authorized to devolve the duty of constructing and
operating the contemplated line of telegraph upon the United States
Telegraph Company, and thereby to relieve themselves from that
duty.

3. CORPORATION—RECOGNITION BY CONGRESS OF AN IMPERFECT OR IN-
COMPLETE ORGANIZATION.—If the United States Telegraph Company
was not regularly and completely organized at the time of the passage
of the last-named act, the congress of the United States could adopt
this imperfect or inchoate organization; and, if it was the purpose of
congress to do so, confer upon it all the powers specified in said act.

4. INJUNCTION—MOTION TO DISSOLVE.— Without finally deciding, upon
this hearing, whether the power to make the contract in question
can be derived from the act of July 2, 1864, it is *held*, in view of the
vast interests involved, and the serious consequences to follow a dis-
solution of the injunction, that for the purposes of this motion there
is sufficient evidence of such authority under that act.

5. ACCEPTANCE OF PACIFIC RAILROAD ACTS BY STATE CORPORATIONS.—
State corporations accepting the provisions of the Pacific Railroad
acts are subject to all the provisions thereof. Following the *Sink-
ing Fund Cases*, (99 U. S. 700.)

6. CONTRACT—DIRECTORS—PERSONAL BENEFIT OR ADVANTAGE SECURED
TO OFFICERS OF CORPORATION CONTRACTING.—As a general proposi-
tion, where one of a body of individuals jointly interested in a matter
consents to take a special advantage to himself, and receives a special
consideration for using his efforts to procure an agreement of the
whole for the benefit of a third party, if such receipt of special
advantage, whether of money or property, be kept secret from his
copartners, or joint stockholders, or those interested, and they act
upon the belief that he is governed by no other interest than that
which is common to them all, the contract is void. But there are
circumstances in connection with the contract in question in this case

v.3,no.13—46

which may or may not take it out of this principle. There was, for example, no attempt at concealment; the benefits secured did not flow to the individual, but to the office; and there is no evidence that it amounted, in point of fact, to a pecuniary sum whose influence would be at all appreciable.

7. QUESTIONS OF DOUBT POSTPONED UNTIL FINAL HEARING.—A contract will not be set aside on preliminary hearing on the ground of its invalidity, except in a clear case; and since the objections to the contract in question may be removed on final hearing, they will not, at present, be regarded as fatal to it.

In Equity. Motion to Dissolve Injunction.

*O. P. Beckwith* and *N. Williams*, for plaintiff.

*Wager Swayne, John T. Dillon, J. P. Usher,* and *Everest & Waggener*, for defendants.

MILLER, C. J. The suit in this case was brought by the Western Union Telegraph Company in one of the state courts of Kansas, and, on application to a probate judge of the proper county, an injunction was allowed, which it is the purpose of the present motion to dissolve. The laws of Kansas make the indorsement of the county judge, on the petition, that an injunction is allowed, to have the same effect as in the courts of the United States, in equity proceedings, is allowed to a writ of injunction regularly issued under the seal of the court.

The county judge made such an indorsement, allowing the injunction as prayed for by the bill. The prayer of the bill was in substance to restrain the Union Pacific Railway Company, the Kansas Pacific Railroad Company, and the American Union Telegraph Company from interfering in any manner with the telegraph wires and other appurtenant apparatus of the Western Union Telegraph Company. The allegation on which the allowance was made, was to the effect that the defendants were about to sever the connection between the wires of the Western Union Telegraph Company and its batteries, so that they could not be worked by the telegraph company, and to connect those wires with the batteries of the American Union Telegraph Company and with batteries of the Union Pacific Railroad Company, and thus destroy the utility of those wires for the purposes of the Western Union

Telegraph Company, which would be thereby excluded from the use of them for 500 or 600 miles, along which they now enjoy that use. There is no denial on the part of either of the defendants that they had such purpose, and it is a part of the case shown by the record, that after the granting of this injunction by the probate judge these parties did sever the wires as threatened, and did connect them or attempt to connect them with the American Union Telegraph Company. An application was made to the probate judge after the allowance of this order to dissolve the injunction. This being refused, the case was removed into the circuit court of the United States for the district of Kansas, and there an application was made to Judge Foster to dissolve the injunction, which was overruled by him. A similar application was made to the circuit court in session before Judges McCrary and Foster; and in that case, while the presiding judge held that there were certain inherent defects in the contract between the Kansas Pacific Railroad Company and the Western Union Telegraph Company, under which the latter erected its wires and was operating them, which would probably authorize a dissolution of the injunction, he declined to dissolve it at the time, in order to give the plaintiff an opportunity, by amended bill, to make a case which would remove those defects. The plaintiffs accordingly filed an amended bill. A demurrer to the amended bill was overruled by Judge McCrary at chambers, whereupon defendants answered; and on that amended bill and answer, and the original papers, another application was made before Judge McCrary at chambers, in Keokuk, for a dissolution of the injunction, and was by him set down to be heard before us at this time, in St. Louis. This application has been heard before Judge McCrary and myself on all the original papers in the case, the amended bill and answer, and a very large number of documents and affidavits now introduced for the first time. After a week of argument, and a very careful consideration of the case, I propose to give the result of that consideration in the present opinion.

The line of telegraph which is the subject of the present

controversy extends from Kansas City, in Missouri, to Denver City, in Colorado; and consists of three wires, the requisite poles, batteries, and other machinery necessary to the successful working of those wires, erected along the line and on the right of way of the Kansas branch of the Pacific Railway Company. That branch has become consolidated with the Union Pacific Railroad Company, and they are both worked and held as one corporation, under the style of the Union Pacific Railway Company. The contract was made in the year 1866, between the Kansas Pacific Railway Company on the one part, and the Western Union Telegraph Company on the other, under which this telegraph line has been mainly erected and operated since it was erected. By that contract, about the construction of which the parties differ somewhat, there is no disagreement as to the following matters: Poles were to be erected on ground embraced within the right of way of the railroad company. That company was either to furnish the poles or pay the price of them if furnished by the Western Union Telegraph Company, and to furnish one wire or pay the cost of that wire. The telegraph company was to furnish the batteries, and to furnish any other wire beyond that one, as it should become necessary, at their own cost. The erection of the poles, the attachment of the wires to them, and the expense of placing the batteries in position, connecting them with the wires, was to be borne jointly and equally by the parties. The lines of these wires were both to be operated by operators appointed by the railroad company, and paid for jointly. The railroad company was to have the exclusive control and use of the first wire put up. The telegraph company was to have the exclusive use of the other wires until, in the opinion of the railroad company, the first wire should be insufficient for the demands of the business of the road; in which event, by a proper compensation, the railroad company was to have the use of another one of the wires put up by the telegraph company. It was one of the provisions of this contract that the railroad company should not send over its wire any commercial messages or any paid messages, or messages for any other person than for its own

business; the purpose of which evidently was to leave the exclusive right to convey such messages to the telegraph company. And it was to enforce this clause of the contract that the injunction was obtained by the Western Union Telegraph Company in the state court. And it is to get rid of this provision and permit the railroad company to convey such messages, and to unite the wires of the telegraph company with the American Union Telegraph Company, that messages may be conveyed, brought by the American Union Telegraph Company, over the wires of the Western Union Telegraph Company, that the present motion is made.

The first legal proposition involved in the case, as presented, is that the Kansas Pacific Railroad Company is forbidden by the acts of congress of the United States under which it was built, and under which it received large grants of money and public lands, and other rights and privileges, to make any such contract as excludes or prevents it from carrying messages for the general public over the telegraphic lines erected on its right of way. I concur with Judge McCrary in the opinions delivered by him on the former applications before him to dissolve this injunction : that on the face of the acts of congress of 1862 and 1864, called "The Pacific Railroad Acts," the obligation of building a telegraph line along its right of way, and of operating that line, or having it operated, under the control of the railroad company, was an obligation which they could not abandon, and which was inconsistent with the contract made in this case, so far as those two acts are concerned; and that if the case rested on the provision of those original Pacific Railroad acts, namely, the act of 1862 and amendatory act of 1864, the present contract would be void, as in violation of the obligations imposed upon the railroad company by those acts; and I do not propose to add anything to what he has said on that subject. If, therefore, there are no other acts of congress on the subject, nor anything else that will remove that inherent vice in the contract between the two companies, the injunction ought to be dissolved and the railroad company permitted to operate the telegraph in accordance with the obliga-

tions which those acts. impose upon it for the benefit of the public. The amended bill, however, which was not before Judge McCrary when he decided that proposition, sets up an act approved July 2, 1864, entitled "An act for increasing the facilities of telegraph communication between the Atlantic and Pacific states and the territory of Idaho," and claims that by virtue of that statute the present contract is a valid one. The first section of that act declared that "the United States Telegraph Company and their associates were authorized to erect a line of magnetic telegraph between the Missouri river and the city of San Francisco, in the state of California, on such route as they may select, to connect with the lines of said United States Telegraph Company now constructed and being constructed through the states of the Union." It gave the right of way over the public lands of the United States, and the right to draw materials for the construction of the line from the same public lands. The fourth section is as follows: "That the several railroad companies authorized by the act of congress of July 2, 1862, are authorized to enter into an arrangement with the United States Telegraph Company, so that the line of telegraph between the Missouri river and San Francisco may be made upon and along the line of said road and branches as fast as said road and branches are built. And if said arrangement be entered into, and the transfer of said telegraph line be made in accordance therewith, to the line of said railroad and branches, such transfer shall, for all purposes of the act referred to, be held and considered a fulfilment on the part of said railroad companies of the provision in the act in regard to the construction of telegraph lines. And in case of disagreement, said telegraph company is authorized to remove their line of telegraph along and upon the line of railroad therein contemplated, without prejudice to the rights of said railroad companies."

The allegation of the amended bill is that the Western Union Telegraph Company was, at the time it made the contract for the erection of the telegraph line now in question, with the Kansas branch of the Pacific Railroad Company, the

successor in right and in power of the United States Tele-
graph Company, mentioned in this act; and that by virtue
of the fourth section of the act the railroad company had
the right to make the contract which was made, and was by
that section relieved from the obligation to construct and
operate a line of telegraph for the public use.   It does not
admit, in my opinion, of any reasonable doubt that if the
United States Telegraph Company mentioned in that statute,
or any company which had the same rights and authorities
on that subject that that company had, entered into an agree-
ment with the Pacific Railroad Company, or any of its
branches built under the authority of the original act of 1862,
which secures the proper construction and operation of a line
of telegraph along its road for the benefit of the public, that
it is absolved from the obligation imposed upon it by the act
of 1862, to construct and to operate such a telegraph line.
It was manifestly the design of this act of 1864 to enable the
United States Telegraph Company to become substituted, by
a proper arrangement with the Pacific Railroad Company
and its branches, to the right to build a telegraph line along
the track and right of way of those railroad companies, and
thereby to relieve those companies from the obligation to
build and operate such a line.

If, therefore, the contract is one which provides for the
erection of a telegraph line to answer both the purposes of
the public and of the railroad company, it is one which is
authorized by this statute, and which relieved the railroad
company from the obligation to construct and build another
line, or any line.   That such is the proper construction of the
fourth section of this act of 1864, is obvious from an exam-
ination of section 19 of the original act of 1862.   That sec-
tion provided "that the several railroad companies herein
named are authorized to enter into an arrangement with the
Pacific Telegraph Company, the Overland Telegraph Com-
pany, and the California Telegraph Company, so that the
present line of telegraph between the Missouri river and San
Francisco may be moved upon or along the line of said rail-
road and branches as fast as said road and branches are

built; and if said arrangement be entered into, and the transfer to said telegraph line be made in accordance therewith, to the line of said railroad and branches, such transfer shall, for all purposes of this act, be held and considered a fulfilment on the part of said railroad companies of the provisions of this act in regard to the construction of said line of telegraph."

The three telegraph companies here spoken of, together constituted, at the time this statute was passed, a continuous line of telegraph from the Missouri river to San Francisco; and it was obvious that the building of another line parallel to that, and not far distant from it, would have a very injurious effect upon the value of the property of those telegraph companies; and it was to protect those companies, and to prevent the injury which would follow from the construction of another line between the same points, over an uninhabited region of country, that congress provided that, by an arrangement with the railroad company, if those companies should remove their wires along the line of that road so they could be used both for railroad purposes and the use of the general public, then the obligation of the railroad company under the act of congress to build another line should no longer exist. The act of 1864, which we have just referred to, concerning the United States Telegraph Company, was clearly designed to give it a similar privilege, and if the arrangement was made, and that company should build or transfer its line to the line of the railroad company, the railroad company, in like manner, was released from the obligation to construct and build another line. I hold it, therefore, to be very clear that if the present telegraph line, as it is now operated and run by the Western Union Telegraph Company, can be traced to the authority of that act of 1864, and the Western Union Telegraph Company, in making that contract, exercised rightfully the powers conferred upon the United States Telegraph Company, that the contract is valid, although it forbids the railroad company to convey commercial messages over the single wire which it has the right to control for its own business.

It is said that the proof offered by complainants fails to

show that it is the proper successor or in any manner entitled to the right which congress conferred upon the United States Telegraph Company. The first item of evidence produced by complainants upon that subject is a certified copy of the organization of a telegraph company, under the laws of the State of New York, styling itself "The United States Telegraph Company." The articles of association of that company, signed by three associates who had taken stock in it, acknowledged before the proper officer, were duly filed in the office of the clerk of the proper county; but it does not appear, from anything before us, that the paper itself or any copy of it was ever filed in the office of the secretary of the state of New York; and it is urged that this objection is fatal to the existence of such a corporation and of its right to make any contract, or transfer any privileges, or rights to any other company.

The question here presented is one in regard to which there exists some conflict of authority in the decisions of the higher courts of other states which have adopted laws similar to that in New York. The state of Illinois, under a statute very similar, has decided that the failure to record a copy of the instrument, or deposit a copy of the instrument, in the office of the secretary of state, is not fatal to the validity of the organization. The state court of Indiana seem to have decided, in a case very nearly similar, that it is. However this may be, it seems to me that the congress of the United States could adopt this imperfect or inchoate organization, needing nothing but the filing of a copy of its articles of association in the office of the secretary of state, and could, if it was the purpose of congress to do so, confer upon it all the rights and powers which it has conferred upon the United States Telegraph Company; and the only question left, therefore, for consideration, is whether this company, of which the articles of association were presented by complainants, was the United States Telegraph Company, to which the act of congress refers. That company, very shortly after these proceedings, took steps to consolidate itself with three other telegraph companies, also organized, or preparing to be organ-

ized, under the authority of the laws of New York, and steps were taken, the proceedings of which are presented to us, which were manifestly designed in effect to amalgamate, and consolidate, and bring together in one organization, the rights and franchises, grants and powers of each of them. This consolidated company adopted the name of the United States Telegraph Company, and it is recited in its articles of association that one of its elements is the United States Company, which existed prior to the act of congress of 1864.

We see here a conscious effort, although there may be some imperfection in carrying that into effect, to unite the powers of this United States Telegraph Company, organized in 1862, prior to the act of congress, with the powers of other companies, and to keep úp its name and authority by the use of the same name in the consolidated company. This last United States Telegraph Company finally became consolidated with the Western Union Telegraph Company; or their fortunes became united and amalgamated in some shape not very clearly made out, and this is the action under which the Western Union Telegraph Company claims the right to make the contract which is the subject of consideration.

I am not prepared to say, with any degree of assurance, that if this case comes to a final hearing, and no more complete evidence is then given of the corporate existence of the first United States Telegraph Company of New York, and of the transfer of the powers granted to it by the act of congress of 1864 to the Western Union Telegraph Company than has been presented on this hearing, that that contract can be sustained under the act of 1864. But I am prepared to hold that there is no such clear case made against the right of the Western Union Telegraph Company to all the franchises and privileges of the original United States Telegraph Company, as to justify me in totally dissolving the present injunction, in view of the consequences which would follow such action, which will be hereafter considered. There is enough testimony to show that there was a purpose and design, through a series of transactions, to vest in the Western Union Telegraph Company the rights which the act of July 2, 1864, con-

ferred upon the United States Telegraph Company, whatever company that might be.   The existence of this United States Telegraph Company, and the assertion of the rights of the Western Union Telegraph Company under it, and the effort to show that the contract now in question was made under the act of 1864, with the successor of that company, is for the first time presented to the court at this hearing, and much that might make it plain either that there was such a right or that there was not such a right, may possibly exist and be brought to light hereafter, when the case can be heard at a final hearing on the issues made by the pleadings.   And this branch of the subject will therefore be postponed for the present.

We must further hold that for the purposes of this motion to dissolve an injunction which has been four times before the consideration of the proper courts already, and which have thus far failed to dissolve it, there is sufficient evidence of the authority to make that contract under the act of 1864. It is said that the Kansas branch of the Pacific Railroad Company was the successor of a corporation organized under the laws of Kansas, and not by the act of congress, and the acts of congress of 1862 and 1864, called "The Pacific Railroad Acts," conferring upon that company the right to build a railroad and telegraph; and that because the Kansas branch of the Pacific Railroad Company does not owe its existence as a corporation to the United States, nor to any law of the United States, that, therefore, it is not bound by the provisions which would forbid it from making a contract such as that made with the Western Union Telegraph Company.   But this proposition cannot be maintained.   The corporation which accepted the grant of the United States of millions of money by way of subsidy, and millions of acres of land, and many other advantages, must be held to have accepted the entire act of congress with all the conditions which it imposed. This was held in the supreme court of the United States in the recent *Sinking Fund Cases*, (99 U. S. Sup. Ct. Rep. 700,) in which the validity of the Thurman act, requiring all those railroads to provide a sinking fund for the payment of their

debt, was resisted by the Central Pacific Railroad Company,
organized under the laws of California, on the ground that
congress could impose no such obligation upon that road.
This proposition, though urged upon the court very forcibly,
and much relied upon in Judge Field's dissenting opinion,
was overruled by the court; and it is held that, in accepting
grants made by congress to those roads, it bound itself by all
the provisions of the act of congress for the government of the
companies.

Another ground of objection to the contract between the
Western Union Telegraph Company and the railroad com-
pany under which this telegraph line was built, which ob-
jection goes to the validity of the whole contract, relates to a
clause in it by which the telegraph company bound itself to
carry over its line private and family messages of its execu-
tive officers without charge to them. The principle on which
this objection rests is that this clause, securing a private
advantage to certain officers of the railroad company, was in
effect a bribe to secure from them the contract to the advantage
of the telegraph company and the disadvantage of the railroad
company. In one of the opinions delivered by Judge Mc-
Crary, on the motions before him to dissolve or modify this
injunction, he expressed the opinion that the clause in the
contract, as it stood on its face, without any explanation of
it, was fatal to the validity of the entire contract. I am not
prepared now to either affirm or deny the soundness of that
proposition.

The language of the contract on that subject is as follows:
"*Fourth.* The business of said railway, including its construc-
tion, lands, and all business of the company, and the family,
private, and the social messages of the executive officers,
shall be transmitted without charge between all telegraph
stations on the line of said railway, and also between all such
stations and the city of St. Louis, Missouri, and over all other
lines in Missouri, Kansas, Colorado, and New Mexico, now
owned or controlled, or that may hereafter be owned or con-
trolled, by the Western Union Telegraph Company: *provided,*
as far as said lines in Colorado and New Mexico are con-

cerned, the said road or roads of the Union Pacific Railway Company, Eastern Division, shall at the time be in process of construction towards Santa Fe, or Denver, or both; and all such business shall be transmitted free of charge over all other lines owned or controlled, or that may hereafter be owned or controlled, by the said telegraph company within the United States, to an amount not exceeding the rate of $4,000 per annum; and for any excess above such rate the telegraph company will deduct and rebate one-half the regular tariff charges; settlements and payments for such excess to be made yearly."

There arises on the face of this clause of the contract an ambiguity as to the precise meaning of the words "executive officers." It is claimed by complainants that "executive officers" here referred to were not the directors, but were the president, superintendent, general manager, and other officers of that class. It must be confessed that there is nothing in the context, and nothing in the definition of the word "executive," until application is made to the facts which concern the nature and functions of the various officers of the company, to determine whether the directors other than the president were included under the phrase "executive officers." If there has been a practical construction of that agreement by the acts of the parties during the 12 years that the contract has been in existence, further proof may show what that construction has been, and give light to the court in deciding the question. While I am strongly in favor of the assertion of the general proposition that where one of a body of individuals jointly interested in a matter consents to take a special advantage to himself, and receives a valuable consideration for using his efforts to procure an agreement of the whole for the benefit of a third party, if such receipt of special advantages, whether of money or of property, be kept secret from his copartners or joint stockholders, or those interested with him in the same matter, and they act upon the belief that he is governed by no other interest than that which is common to them all, the contract so obtained on the part of the third person is flagitious, and

should be held to be void. There are circumstances in connection with this contract which may or may not be held to take it out of this principle. The first one of these circumstances which strikes one impressively is that there was no attempt to conceal from the stockholders of the railroad company, nor from anybody interested in its affairs, this clause of the contract by which the executive officers were to have this special privilege in the use of the telegraph wires. There was, therefore, absent the indication which secrecy in such case gives of a corrupt and improper motive. It is also to be observed that the benefits secured did not flow to the individual, but to the office, and that as soon as any one ceased to be a member of the executive office he ceased to have the privilege conferred by this contract; and there is no evidence before the court that this privilege was enjoyed for any length of time by any one individual, or that it amounted in point of fact to a pecuniary sum whose influence would be at all appreciable.

These propositions, and the facts which may be proved on the final hearing in regard to the terms under which these privileges were to be used, and the reasons why they were, as suggested by plaintiff's counsel, designed to relieve the railroad company itself of a burden which it would have borne if the telegraph company had not made these grants of privileges, all lead me to doubt very much whether the contract will be finally held invalid on account of that clause in its original conception. For the same reason, then, that I have already stated in regard to the other allegation of invalidity of the contract that the objection may be removed on the final hearing; that it is not at all clear to me that the objection is a valid one, as the matter stands; and on account of the great and important consequences which would flow from a dissolution of the injunction,—I do not think that, on this motion, the objection should be held to be fatal to the contract.

I wish again to recall the fact that four or five motions to dissolve this injunction have been made, and overruled as many times by as many as three or four different and very

competent judges. It is also proper to look to the consequences which would flow from a dissolution of the injunction. It is made perfectly plain, both by the answer of the defendants, and by what they have done and what they propose to do, that if this injunction is dissolved, and another injunction which covers the telegraph along the line of the Union Pacific Railroad from Omaha to Ogden, that the Western Union Telegraph Company,—which now and for 12 or 15 years past has been working a continuous line, and the only line, between the Atlantic coast and the Pacific coast, and especially between the Missouri river and San Francisco,—will be at once deprived of the power to work any such line at all until it shall be enabled to construct a new line at least 600 miles in length.

This corporation has come to be one whose property is of immense value—a value almost unknown to any one. The shares of its stock are scattered all through the country, and now are, and long have been, the most profitable shares of any corporation now in existence. It has done the business of almost the entire country for many years past west of the Alleghany mountains—all the business west of the Missouri river. To suspend this business by the act of a single party, to permit the railroad company, both at Omaha and Kansas City, to cut off the connections of these wires with the Union Pacific Railroad Company east of those points, and to turn those wires into that of a rival company, is to produce an amount of financial ruin hard to be appreciated. Telegraph lines and telegraph business, like the good-will of a newspaper and hotel, have a character so different from ordinary personal property, or ordinary real estate, that when we come to deal with injuries to it we must look at it in a different light from what we do the injuries to those classes of property.

The total suspension of its business for the period of time necessary to construct a line from Omaha or Kansas City to Ogden would produce an irreparable injury, within the meaning of that term, as used in equity proceedings. It would be an injury to that company by no means commensurate with

any good to result to the other company which is in contest with it.   It is eminently fit, therefore, that before the judges at chambers should pronounce an order dissolving an injunction which merely restrains the hands of the other side from this destructive proceeding, that they shall be satisfied that the rights of the party seeking this dissolution are clear, and that they are entitled to exercise the powers which will produce such disastrous results.   As we have already said, we are not by any means satisfied, at least I am not, that such a right exists in the plaintiff; and I have a strong belief that it is the duty of the court to keep the hands of both of these parties so tied up, and so far at liberty only, as that the public shall not suffer, and each shall not destroy the other, until this litigation shall come to a final close by a full hearing on the merits of the case.

As I have already said, the injunction stands now upon the order of the probate judge in Kansas, an order which merely allowed the injunction as prayed in the bill.   There seems to be a dispute between the counsel on either side as to the precise extent of the relief prayed in that bill, and therefore as to the extent and meaning of the injunction as it now stands.   We are both of opinion that the railroad company has the right, as it has always had, to the exclusive use of the first wire on the telegraph poles; and we are of opinion that as the matter stands at this stage of the proceeding, that company should have the right, pending the further litigation of the case, to use that wire, not only for the ordinary business of the road, but for the purpose of transmitting commercial and paid messages for the public in general; that it has no right to interfere with the Western Union Telegraph Company in the use of the other two wires for the purpose of carrying all messages of whatever class it may choose to carry over those wires; and that it is proper that an order should be made, instead of the order of the probate court, which is ambiguous and indefinite, which shall stand to represent this principle, and as a substitute for that order.

NOTE.—See *ante*, 1; 417; 423.