UNITED STATES *v.* WESTERN UNION TEL. Co. *et al.*

(*Circuit Court, D. Nebraska.* March 30, 1892.)

1. RAILWAY AND TELEGRAPH COMPANIES—GOVERNMENT AID—ALIENATION OF FRANCHISE.
Under the general rule that the grant of a franchise of a public nature is personal to the grantee, and cannot be alienated without the consent of the government, the privilege granted to the Union Pacific Railway Company by the acts of 1862 and 1864 of constructing and operating a telegraph line along its right of way, for public and commercial uses, carried with it a corresponding obligation on the part of the company to itself operate such line, and it had no authority to transfer the franchise to any other corporation.

2. SAME.
Nor could such authority be inferred from section 19 of the act of 1862, which authorized the company, in discharge of its obligation, in the first instance to make an arrangement with the companies owning the then existing telegraph line between San Francisco and the Missouri river, whereby that line might be removed and placed upon the railroad right of way, the company having failed to make such an arrangement, and having accepted the whole franchise by constructing a new line of its own.

3. SAME—CONSOLIDATION OF COMPANIES.
Act Cong. July 2, 1864, providing "for increased facilities of telegraphic communication," and commonly known as the "Idaho Act," granted to the United States Telegraph Company, a New York corporation, a right to construct a line from the Missouri river to the Pacific, and also authorized the railroad companies to make an arrangement with this company for the construction of its line, like that authorized by section 19 of the act of 1862. Under this act part of the line was constructed in conjunction with the Kansas Pacific Company; and then the United States Telegraph Company consolidated with the Western Union Telegraph Company, and the line was finished under an arrangement between the latter company and the railroad. *Held,* that this franchise was granted for the purpose of constructing an independent line, and, although the consolidation was authorized by the laws of New York, the Western Union Company did not thereby obtain any right to acquire the telegraphic franchises granted by the Union Pacific acts.

4. SAME—REGULATION BY GOVERNMENT.
In view of the fact that the telegraphic franchises granted by the Union Pacific acts were inalienable by the grantees, and also of the express reservation therein of the right to "add to, alter, amend, or repeal," congress had full power to pass the act of August 7, 1888, directing the railroad and telegraph companies which received government aid to henceforth operate their telegraph lines by themselves alone, and through their own officers and employes.

5. SAME—CONSTRUCTION ACT.
In a proceeding instituted by the United States to annul a contract whereby the telegraphic franchises of the Union Pacific Railway Company were transferred to the Western Union Telegraph Company, the intention and power of congress to prevent such transfer being clear, the court cannot consider any arguments based upon the alleged fact that the contract is beneficial to the pecuniary interests of both the railway company and the public.

6. SAME—JURISDICTION OF COURTS.
The government, being the creator of the Union Pacific Railway Company, and a large contributor to its finances, and having a pecuniary interest in its successful management, has full supervisory power over it, and may make and enforce through the courts reasonable regulations not interfering with vested rights.

7. SAME—EQUITY JURISDICTION.
Although the main purpose of the act of 1888 is to compel the railroad companies to exercise their telegraphic franchises directly by their own officers and employes, yet, in enforcing this requirement as against the Union Pacific Company, the government may properly proceed by a bill in equity instead of by *mandamus,* since the Western Union Telegraph Company has acquired property along the right of way, and its interests therein can only be properly defined and protected by the flexible procedure of a court of equity.

In Equity. Bill by the United States against the Western Union Telegraph Company and the Union Pacific Railway Company to cancel a contract, whereby the telegraphic franchises of the railroad company

were improperly transferred to the telegraph company, and to compel the railroad company to exercise that franchise directly through its own officers and employes.     Decree for complainant.

*Charles H. Aldrich,* for the United States.

*John F. Dillon, J. M. Woolworth, Rush Taggart,* and *J. I. Wilson,* for defendants.

BREWER, Circuit Justice.     On August 7, 1888, congress passed an act, whose title, first and fourth sections, are as follows:

"Chap. 772. An act supplementary to the act of July first, eighteen hundred and sixty-two, entitled 'An act to aid in the construction of a railroad and telegraph line from the Missouri river to the Pacific ocean, and to secure to the government the use of the same for postal, military, and other purposes,' and also of the act of July second, eighteen hundred and sixty-four, and other acts amendatory of said first-named act.

"Be it enacted by the senate and house of representatives of the United States of America in congress assembled, That all railroad and telegraph companies to which the United States has granted any subsidy in lands or bonds or loan of credit for the construction of either railroad or telegraph lines, which, by the acts incorporating them, or by any act amendatory or supplementary thereto, are required to construct, maintain, or operate telegraph lines, and all companies engaged in operating said railroad or telegraph lines, shall forthwith and henceforward, by and through their own respective corporate officers and employes, maintain and operate for railroad, governmental, commercial, and all other purposes, telegraph lines, and exercise by themselves alone all the telegraph franchises conferred upon them, and obligations assumed by them under the acts making the grants as aforesaid.

\*         \*         \*         \*         \*         \*         \*         \*         \*

"Sec. 4. That, in order to secure and preserve to the United States the full value and benefit of its liens upon all the telegraph lines required to be constructed by and lawfully belonging to said railroad and telegraph companies referred to in the first section of this act, and to have the same possessed, used, and operated in conformity with the provisions of this act and of the several acts to which this act is supplementary, it is hereby made the duty of the attorney general of the United States, by proper proceedings, to prevent any unlawful interference with the rights and equities of the United States under this act, and under the acts hereinbefore mentioned, and under all acts of congress relating to such railroads and telegraph lines, and to have legally ascertained and finally adjudicated all alleged rights of all persons and corporations whatever claiming in any manner any control or interest of any kind in any telegraph lines or property, or exclusive rights of way upon the lands of said railroad companies, or any of them, and to have all contracts and provisions of contracts set aside and annulled which have been unlawfully and beyond their powers entered into by said railroad or telegraph companies, or any of them, with any other person, company, or corporation."     25 St. p. 382.

Thereafter this bill was filed by the government against the Western Union Telegraph Company and the Union Pacific Railway Company, the object of which, it may be stated in a general way, is to secure a decree canceling and annulling a contract of date July 1, 1881, made by and between the two companies, by which, as claimed, the telegraphic franchises granted to the railway company have been improperly trans-

ferred to the telegraph company, and also compelling the discharge by the former company of all the telegraphic obligations imposed by its charter and the various acts of congress. The hinge of the case is this contract, and the primary question is as to its validity.

I pass, therefore, to an inquiry into its terms and extent. It was made in 1881 by the railway with the telegraph company. To a correct understanding of its terms and an interpretation of its meaning, the prior history of these two companies, and their relations to each other, must be stated. The railway company is a consolidated corporation. It was not named in the Pacific Railroad acts of 1862 and 1864; but was formed, as authorized by those acts, by the consolidation of three companies, beneficiaries thereunder. Of those constituent companies it is enough to say that one—the Union Pacific Railroad Company—was authorized to construct what was afterwards known as the "Main Line," and which, as finally constructed, extends from Council Bluffs and Omaha, on the Missouri river, to Ogden, in Utah, where it forms a connection with the Central Pacific; another was a corporation created by the legislature of the territory of Kansas, described in the act of 1862 as the "Leavenworth, Pawnee & Western Railroad," whose name was afterwards changed to "Union Pacific Railroad Company, Eastern Division," and again to "Kansas Pacific Railway Company," and which was authorized to build a road from the junction of the Kaw and Missouri rivers, at Kansas City, westward through Kansas, to connect with the main line at the 100th meridian of longitude west from Greenwich, which point of junction was afterwards changed and finally located at Cheyenne, and which company did in fact build the line from Kansas City west to Denver; and the third, the Denver & Pacific Railway & Telegraph Company, which, under the authority of the act of March 3, 1869, (15 St. p. 324,) built and owned the line from Denver to Cheyenne. A consolidation of these companies took place in January, 1880. It secured to the new the rights and continued to it the obligations of the constituent companies. The original Union Pacific Railroad act of July 1, 1862, (12 St. p. 489,) creating the corporation, in the first section authorized and empowered it "to lay out, locate, construct, furnish, maintain, and enjoy a continuous railroad and telegraph;" and thereafter making to it a large grant of lands and loan of bonds, added in the sixth section "that the grants aforesaid are made upon condition that said company shall pay said bonds at maturity, and shall keep said railroad and telegraph line in repair and use." Counsel for the government says in his brief that the words "railroad and telegraph" are used in connection no less than 38 times in the act. The significance of this conjunction of words is, as claimed, the vesting of a joint railroad and telegraphic franchise in a single corporation, with personal obligation to discharge the duties imposed by each franchise, and with inability, by contract or otherwise, to transfer the duties created by either to any other corporation or individual. With delightful emphasis reference is made to the motto placed by the learned counsel for the railway company on a brief prepared by him in 1880, in a litigation then pending between the rail-

way and telegraph company: "Telegraph franchises and duties to the government and the public of the Pacific Railway Companies: Indivisible, indestructible, inalienable, and of perpetual obligation." That is undoubtedly the general law as to all franchises of a public character. It is said that a special exception exists in this case by reason of the nineteenth section of the act, which provides—

"That the several railroad companies herein named are authorized to enter into an arrangement with the Pacific Telegraph Company, the Overland Telegraph Company, and the California State Telegraph Company, so that the present line of telegraph between the Missouri river and San Francisco may be moved upon or along the line of said railroad and branches as fast as said roads and branches are built; and, if said arrangement be entered into, and the transfer of said telegraph line be made, in accordance therewith, to the line of said railroad and branches, such transfer shall, for all purposes of this act, be held and considered a fulfillment on the part of said railroad companies of the provisions of this act in regard to the construction of said line of telegraph. And in case of disagreement said telegraph companies are authorized to remove their line of telegraph along and upon the line of railroad herein contemplated, without prejudice to the rights of said railroad companies named herein."

This section recognizes the present existence of a telegraph line between the Missouri river and San Francisco, the property of certain telegraph corporations. It was a line whose construction the government had secured in this way: On June 16, 1860, congress passed an act entitled "An act to facilitate communication between the Atlantic and Pacific states by electric telegraph." 12 St. p. 41. It authorized the secretary of the treasury—

"To advertise for sealed proposals, to be received for sixty days after the passage of this act, (and the fulfillment of which shall be guarantied by responsible parties, as in the case of bids for mail contracts,) for the use by the government of a line or lines of magnetic telegraph, to be constructed within two years from the thirty-first day of July, eighteen hundred and sixty, from some point or points on the west line of the state of Missouri, by any route or routes which the said contractors may select, (connecting at such point or points by telegraph with the cities of Washington, New Orleans, New York, Charleston, Philadelphia, Boston, and other cities in the Atlantic, Southern, and Western states,) to the city of San Francisco, in the state of California, for a period of ten years, and shall award the contract to the lowest responsible bidder or bidders, provided such proffer does not require a larger amount per year from the United States than forty thousand dollars: * * * provided, that no such contract shall be made until the said line shall be in actual operation, and payments thereunder shall cease whenever the contractors fail to comply with their contracts: * * * and provided, also, that said line or lines * * * shall be open to the use of all citizens of the United States during the term of the said contract, on payment of the regular charges for the transmission of dispatches."

On September 5, 1860, the directors of the Western Union Telegraph Company passed a resolution authorizing its president, Hiram Sibley, to put in a bid for the contemplated telegraph line, in his own name, but for the benefit of the company and such associates as might thereafter be united with it. In pursuance of this resolution, Mr. Sibley put in an offer, which was accepted by the secretary of the treasury on Septem-

ber 22, 1860, and the line from Omaha westward to the Pacific ocean was constructed and put in operation. While the construction of this line was carried on in the names of other corporations,—as was also the contract, the personal agreement of Mr. Sibley,—yet all was at the instance and for the benefit of the Western Union Company, and those corporations were subsequently merged in, and the contract transferred to, that company. It was this line, thus aided by the government, whose transfer to the right of way was authorized by section 19. Now, this section 19 grants some rights and privileges, but what are they? Evidently, with the broadest construction, only the privilege of transferring by arrangement the telegraphic franchise to the named telegraph companies. It was a privilege to the railroad company; and it was the Union Pacific Railroad Company alone which, so far as this case is concerned, had the benefit of such section. It had the option either to build a telegraph line and accept the franchise itself, or transfer the same by agreement to those telegraph companies. It exercised this option, and built a telegraph line from Omaha to Ogden; and the telegraph companies, on their part, exercised the right, given in the last part of the section, of transferring their line to the right of way. The privilege given to the railroad company was not of building the telegraph line, and then leasing it to some other company, or transferring it, with the telegraphic franchise, to such other company. Indeed, reading the section narrowly, and by the letter, it, as counsel for the government says, refers only to an arrangement for the construction, and does not include the operation and maintenance, of the telegraph line. While the section may have a broader meaning, and include the whole franchise, yet the use of the single word "construction" limits the option to that which includes construction, and means simply that, in view of the hazard and magnitude of the enterprise, the railroad company was given the privilege of transferring the telegraph burden at the commencement to companies which already had a telegraph line, and cannot be construed as giving to the railroad company a general permission, after it has accepted the whole franchise and built a telegraph line, to lease or otherwise transfer that and the telegraphic franchise to another company. Such was the construction placed upon this section by Judge McCrary and Justice Miller, as far back as 1880, in suits then pending between the Western Union Telegraph Company and the Union Pacific Railway Company. 1 McCrary, 418, 541, 581, 586, 1 Fed. Rep. 745, and 3 Fed. Rep. 1, 423, 721. In the last case, on the last page, may be found the language of Mr. Justice Miller, as follows:

"I concur with Judge McCrary, in the opinions delivered by him on the former applications before him to dissolve this injunction, that on the face of the acts of congress of 1862 and 1864, called 'The Pacific Railroad Acts,' the obligation of building a telegraph line along its right of way, and of operating that line, or having it operated under the control of the railroad company, was an obligation which they could not abandon, and which was inconsistent with the contract made in this case, so far as those two acts are concerned; and that, if the case rested on the provision of those original Pacific Railroad acts, namely, the act of 1862 and amendatory act of 1864, the present contract

would be void, as in violation of the obligations imposed upon the railroad company by those acts."

That litigation grew out of these facts: Prior thereto the Union Pacific Railroad Company and the Kansas Pacific Railway Company—two of the constituent companies of the present railway company defendant—had made contracts with the Atlantic & Pacific Telegraph Company and the Western Union Telegraph Company, respectively, for the telegraphic business on their lines. The railway companies sought to break those contracts, take possession of the telegraph lines, and make new arrangements with the American Union Telegraph Company, and to prevent this action by the railroad companies was the purpose of the litigation; so that the question of the powers of the railroad companies came directly in issue. I agree with those judges that the privilege granted by section 19 was exhausted when the railroad company built its telegraph line, and accepted the telegraphic franchise.

Coming now to the act of July 2, 1864, commonly known as the "Idaho Act," (13 St. p. 373.) This contemplated a new and independent telegraph line to the Pacific. This is apparent from the title, reading, as it does, "for increased facilities of telegraphic communication," and it granted to a company other than those mentioned in the act of 1862, to wit, the United States Telegraph Company, the right to construct a line from the Missouri river to the Pacific, and also authorized the railroad companies to make a like arrangement with this company for the construction of its telegraph line. What, if anything, was done under this act is not entirely clear from the testimony. The construction of the Kansas Pacific Railroad from the Missouri river westward through Kansas was commenced by Samuel Hallett, as a contractor with the company. As such contractor, and for the company, he built both the railroad and the telegraph line as far as Lawrence. Thereafter John D. Perry, of St. Louis, and his associates, came into possession and control. From Lawrence to Rossville, a distance of less than 50 miles, it would seem as though the United States Telegraph Company and the railroad company joined in the expense of constructing the telegraph line, but under what exact arrangement is not disclosed. Then the United States Telegraph Company was consolidated with the Western Union Telegraph Company; and the latter with the railroad company, under some arrangement, afterwards put into a contract of date October 1, 1886, completed the telegraph line to Denver. It appears that at the time the act of July, 1864, was passed there was a corporation organized under the laws of the state of New York, known as the "United States Telegraph Company." Shortly thereafter it was consolidated with three other companies into a new corporation, bearing the same name, and this consolidated company was the one which shared in the building of the telegraph line from Lawrence to Rossville. It then consolidated with the Western Union Telegraph Company,—also a New York corporation, and one which controlled and afterwards absorbed the corporations named in the nineteenth section of the act of 1862,—as the owners of the telegraph line, and with whom the railroad companies

were authorized to make arrangements. It may be conceded that the consolidations were authorized by the laws of the state of New York; but does it follow that the Western Union Telegraph Company, by virtue thereof, acquired the right under the Idaho act to arrange for the telegraphic franchises granted by the Union Pacific act? I think not. The privilege given by the Idaho act was personal to the United States Telegraph Company. It was not to it and its assigns, or to it and its successors. The general rule is that a grant of a franchise of a public nature is personal in its character, and incapable of transfer without the sanction of the government making the grant to any other person or corporation. It creates a contract between the government and its grantee, and on the part of the latter carries with it the obligation that it will personally discharge the duties and exercise the rights of that franchise. It is true that Mr. Justice MILLER seemed to be of opinion, in the case referred to, that the Western Union Telegraph Company succeeded to all the rights of the United States Telegraph Company; and yet, as the case when it came before him was on a motion to dissolve an injunction, he left this matter open to further consideration on the final hearing. In his opinion (page 591, 1 McCrary, and page 731, 3 Fed. Rep.) he says:

"The existence of this United States Telegraph Company, and the assertion of the rights of the Western Union Telegraph Company under it, and the effort to show that the contract now in question was made under the act of 1864 with the successor of that company, is for the first time presented to the court at this hearing, and much that might make it plain either that there was such a right or that there was not such a right may possibly exist and be brought to light hereafter, when the case can be heard at a final hearing on the issues made by the pleadings; and this branch of the subject will therefore be postponed for the present."

While I am satisfied as to the formalities attending these consolidations, I am of opinion that by them the rights and privileges given to the United States Telegraph Company by the Idaho act were not transferred to the Western Union Company. Beyond the general rule of law referred to, it is obvious from the legislation of congress that two independent lines were contemplated, and that it was not intended to grant to a company having one line the right to build and operate another. The companies which had the line then in existence were known to congress. It had given to the railroad companies the right to make arrangement with them, and by that arrangement to make their telegraph line the fulfillment of the telegraph obligation cast upon the railroad companies. If congress had intended that the same companies should build and operate another line, it could easily have made the grant to them. The fact that it named another, an independent company, is evidence that competing lines were its purpose; and with that purpose obvious on the face of these statutes it cannot be that by consolidation this purpose could be frustrated.

It may be said that the law of New York authorizing consolidation of corporations was in force at the time of the passage by congress of the act of July 2, 1864; that congress must be presumed to have known

this, and therefore impliedly consented to any subsequent transfer of the franchise granted by that act to any company into which the United States Telegraph Company might lawfully be consolidated; and there is force in the argument. If the subject of the grant was land or other tangible property, it would, in the absence of restrictive words in the act of congress, be true that the subsequent disposal of such tangible property could be made by the grantee corporation in any way authorized by the laws of the state of New York. But there is an element of personality of obligation in a franchise which is not found in a grant of tangible property, and, in view of the intent of congress, displayed by its several acts, the true construction seems to me to be that it granted this franchise and privilege to be exercised by the corporation named, as grantee, and by it alone, and only so long as it preserved an independent corporate existence.

It is worthy of note, also, that when the application was made by the Kansas road for the government aid promised on completion of the first 40 miles, the affidavit of the president stated "that said company have completed about 40 consecutive miles of said railway and telegraph, ready for the service contemplated by the acts of congress of 1862 and 1864;" also that the act of March 3, 1869, (15 St. p. 324,) authorizing an arrangement by which the Denver & Pacific Railway & Telegraph Company should have the benefit of the Pacific Railroad acts so far as respects that portion of the Kansas branch which lies between Denver and Cheyenne, in terms authorized the Kansas Company to contract with the Denver Company "for the construction, operation, and maintenance of that part of its line of railroad and telegraph between Denver," etc., with the proviso in section 2 that there should be "a continuous line of railroad and telegraph from Kansas City, by way of Denver, to Cheyenne." Obviously this legislation was upon the assumption by congress—an assumption based, doubtless, on the report made by the president of the Kansas Company—that that company had made no contract with the United States Telegraph Company, and was the builder and owner of both the railroad and telegraph line from Kansas City westward. More than that, the articles of consolidation, signed in 1880, by which the Union Pacific Railroad Company, the Kansas Pacific Railway Company, and the Denver & Pacific Railway & Telegraph Company were consolidated into the present railway company defendant, recite that the first-named company owns its line of railroad and telegraph, and that the second company owns and operates its railroad and telegraph line. These recitals, good against the railway company, seem to imply that up to the time of the contract complained of the same corporations owned both railroad and telegraph, whatever privileges of use of the latter might by previous contracts have been transferred to other companies. These considerations lead to the conclusion that at the time of that contract the double franchise of railroad and telegraph lines remained intact in the railway company, incapable of alienation without further sanction of congress. Hence, irrespective of the reservation in the original Pacific Railroad acts of the right to "add to, alter, amend,

or repeal," and the provision in the act of 1888 directing the personal exercise of the telegraphic franchise by the railroad company, I should be forced to examine the contract of 1881 as the act of a company, charged with a railroad and telegraphic franchise, and incapable of alienating either. But the act of 1888 is not to be ignored. It is pertinent, for it removes all doubts. It is a valid exercise by congress of its power to alter and amend. It does not purport to grant a new or take away an old franchise. It attempts simply to regulate the manner in which a franchise already granted and possessed shall be exercised, and surely the power to regulate the manner of exercise is within the reserved power to alter and amend the charter. With reference to the scope of this power to alter and amend, and concerning the present railway company defendant and its charter, Chief Justice WAITE said in the *Sinking Fund Cases*, 99 U. S. 700, 720:

"We are of the opinion that congress not only retains, but has given special notice of its intention to retain, full and complete power to make such alterations and amendments of the charter as come within the just scope of legislative power. That this power has a limit, no one can doubt. All agree that it cannot be used to take away property already acquired under the operation of the charter, or to deprive the corporation of the fruits actually reduced to possession of contracts lawfully made; but, as was said by this court, through Mr. Justice CLIFFORD, in *Miller* v. *State*, 15 Wall. 498: 'It may safely be affirmed that the reserved power may be exercised, and to almost any extent, to carry into effect the original purposes of the grant, or to secure the due administration of its affairs, so as to protect the rights of stockholders and of creditors, and for the proper disposition of its assets;' and again, in *Holyoke Co.* v. *Lyman*, Id. 519: 'To protect the rights of the public and of the corporators, or to promote the due administration of the affairs of the corporation.' Mr. Justice FIELD, also speaking for the court, was even more explicit when, in *Tomlinson* v. *Jessup*, Id. 459, he said: 'The reservation affects the entire relation between the state and the corporation, and places under legislative control all rights, privileges, and immunities derived by its charter directly from the state;' and again, as late as *Railroad Co.* v. *Maine*, 96 U. S. 510: 'By the reservation the state retained the power to alter it [the charter] in all particulars constituting the grant to the new company formed under it of corporate rights, privileges, and immunities.' Mr. Justice SWAYNE, in *Shields* v. *Ohio*, 95 U. S. 324, says, by way of limitation: 'The alterations must be reasonable. They must be made in good faith, and be consistent with the object and scope of the act of incorporation. Sheer oppression and wrong cannot be inflicted under the guise of amendment or alteration.' The rules, as here laid down, are fully sustained by authority. Further citations are unnecessary."

Nothing need be added to this definition of the scope and limits of such a power. Within that definition the act of 1888 was valid legislation; and it, in effect, says to the railway companies: "Notwithstanding you may have in the past discharged the duties of your telegraphic franchise through other corporations and by other instrumentalities, you must in the future discharge them solely through your employes." It orders off from this franchise all other corporations.

Coming, then, to the contract, it is too long to be quoted in full. Its obvious purpose and expected effect, and, in view of the testimony as to

what has taken place since, it may be added, its actual result, was and has been to transfer the telegraphic franchise to the Western Union Telegraph Company. It must be borne in mind that this franchise, as granted by the acts of 1862 and 1864, was not the mere right to place a telegraph wire along the railroad for its sole use. A telegraph wire is a necessary part of a complete railroad under the urgencies of railway operation to-day. The grant of a franchise to build a railway carries with it the right to add such a wire. It is as much a part of the railroad as its depots or its wrecking trains. So nothing of this kind was contemplated in the telegraphic franchise granted by the acts of 1862 and 1864. What was meant was a telegraph line for public and commercial use, as independent and complete in itself as though not built along the railroad right of way, or used at all in connection with its operation.

Now, this contract operates to transfer such telegraphic franchise to the Western Union Telegraph Company, and was intended to make it the exclusive beneficiary thereof. Its purpose, as declared, is "of providing telegraphic facilities for the parties hereto, and of maintaining and operating the lines of telegraph along the railway company's railroads in the most economical manner in the interest of both parties, and for the purpose of fulfilling the obligations of the railway company to the government of the United States and the public in respect to the telegraphic service required by the act of congress of July 1, 1862." The third clause reads that—

"The railway company, so far as it legally may, hereby grants and agrees to assure to the telegraph company the exclusive right of way on, along, upon, and under the line, lands, and bridges of the railway company, and any extensions and branches thereof, for the construction, maintenance, operation, and use of lines of poles and wires, or either of them, or underground or other system of communication for commercial or public uses or business, * * * and the railway company will not transport men or material for the construction or operation of a line of poles and wire or wires or underground or other system of communication in competition with the lines of the telegraph company, party hereto, except at and for the railway company's regular local rates, nor will it furnish for any competing line any facilities or assistance that it may lawfully withhold, nor stop its trains, nor distribute material therefor at other than regular stations: provided, always, that in protecting and defending the exclusive rights given by this contract the telegraph company may use and proceed in the name of the railway company, but shall indemnify and save harmless the railway company from any and all damages, costs, charges, and legal expenses incurred therein or thereby."

And the fourth clause provides that—

"It is mutually understood and agreed that all of the telegraph lines and wires covered by this contract, whether belonging to or used by the telegraph company or the railway company, for the purposes of this contract, as herein provided, shall form part of the general system of the telegraph company. The railway company further agrees that its employes shall transmit over the lines owned, controlled, or operated by the parties hereto all commercial telegraph business offered at the railway company's offices, and shall account to the telegraph company exclusively for all of such business and the receipts thereon, as provided herein. No employe of the railway company shall,

while in its service, be employed by, or have any connection with, any other telegraph company than the telegraph company party hereto, and the telegraph company shall have the exclusive right to the occupancy of and connection with the railway company's depots or station houses for commercial or public telegraph purposes as against any other telegraph company: provided, that if any person or party, or any officer of the government, tender a message for transmission over the railway telegraph lines between Council Bluffs and Ogden, at any railway telegraph station between those points, and require that the service be rendered by the railway company, the operator to whom the same is tendered shall receive and forward the same, accordingly, at the rates to be fixed by the railway company, to the point of destination, if not beyond its own lines. If the destination of said message be beyond said railway company's lines, the telegraph company, when receiving the same at the point at which it leaves the said railway lines, may demand the prepayment of tolls for the service of forwarding the message on its own lines: provided, however, that the local receipts of the railway company on such messages shall be divided between the parties hereto in the same manner and subject to the same conditions as provided in the tenth clause of this agreement."

Further, in the 5th, 6th, and 7th clauses we find these provisions:

"*Fifth.* The railway company agrees to furnish at its own expense all the labor, except a foreman, for the maintenance, repair, and renewal or reconstruction of the existing lines and wires along all the railway company's railroads, and for the construction, maintenance, repair, and renewal or reconstruction of such additional wires or lines of poles and wires as may be required for commercial or railroad telegraph purposes along said railroads, and along future branches and extensions thereof, and along new railroads constructed or acquired by the railroad company, except as modified in the sixth clause hereof. The telegraph company shall furnish a foreman skilled in the work of telegraph construction, who shall have charge of the construction and reconstruction of the lines and wires and the direction of the labor furnished by the railway company for such purposes, said foreman to be subordinate to the superintendent mentioned in article twelfth of this agreement.

"*Sixth.* Each party hereto shall pay one-half of the entire cost of all poles, wires, insulators, tools, and other material used for the maintenance, repair, and renewal or reconstruction of existing lines and wires along all of the railway company's railroads, and for the construction, maintenance, repair, and renewal or reconstruction of such additional wires or lines of poles and wires as may be required for commercial or railroad telegraph purposes along said railroads, and along future branches or extensions thereof, and along new railroads constructed or acquired by the railway company, until the total number of wires shall amount to three for the exclusive use of each party hereto between Council Bluffs and Ogden; two for the exclusive use of each party hereto between Kansas City and Denver; and one for the exclusive use of each party hereto on all other portions of the railway company's railroad branches and extensions. Each party hereto shall pay the entire cost of the construction, maintenance, repair, and renewal or reconstruction of wires for its exclusive use in excess of the number hereinbefore mentioned. The material of the telegraph company for additional wires to be transported free of charge by the railway company over its own lines, as hereinafter provided. The telegraph company agrees to furnish at its own expense all blanks and stationery for commercial or other public telegraph business, and all instruments, main and local batteries, and battery material for the operation of its own and the railway company's wires and offices.

"*Seventh.* Each party hereto shall have the exclusive use, under the division of the cost of material hereinbefore provided, of not exceeding three wires between Council Bluffs, Iowa, and Ogden, Utah, and not exceeding two wires between Kansas City, Mo., and Denver, Col., and not exceeding one wire on all other portions of the railway company's railroads: provided, however, that in case either party hereto shall require additional wires between said places hereinbefore mentioned, or along any of the other railroads of the railway company, the party requiring such additional wire or wires shall furnish at its own expense all the material for the construction, maintenance, repair, and renewal or reconstruction of such additional wire or wires."

Also in the 9th, 10th, 12th, 13th, and 14th clauses these provisions:

"*Ninth.* The railway company agrees to transport free of charge over its railroads, upon application of the superintendent or other officer of the telegraph company, all officers of the telegraph company when traveling on its business, and all employes of the telegraph company when traveling on the telegraph company's business connected with or pertaining to the lines or wires and offices along any of the railroad company's railroads. And the railroad company further agrees to transport and distribute free of charge along the line of any and all its railroads all poles and other materials for the construction, maintenance, operation, repair, or reconstruction of the lines and wires covered by this agreement, and of such additional wires or lines of poles and wires as may be erected under and in pursuance of the provisions of this agreement; also all material and supplies for the establishment, maintenance, and operation of the offices along said railroads; it being understood that no charge shall be made for the transportation of poles or other materials over any of the railway company's railroads for use on any other of its railroads.

"*Tenth.* The telegraph company agrees to supply instruments and local batteries, and blanks and stationery for commercial telegraph business as hereinbefore provided, at offices established and maintained by the railway company. At all telegraph stations of the railway company its employes shall receive, transmit, and deliver such commercial or public messages as may be offered, and shall render to the telegraph company monthly statements of such business, and full accounts of all receipts therefrom, and the railway company shall cause all of such receipts to be paid over to the telegraph company monthly. As compensation to the railway company for the services herein provided for, the telegraph company agrees to pay or return to the railway company monthly one half of the cash receipts at telegraph stations maintained and operated by and at the expense of the railway company, tolls on ocean cable messages and tolls for lines of other companies excepted, all of which shall be retained by the telegraph company, it being understood that the railway company shall not be entitled to any portion of the tolls on ocean cable messages, or tolls belonging to lines of other companies, or to any portion of amounts checked against other offices. The railway company agrees that its employes shall not compete with the telegraph company's offices in the transaction of commercial telegraph business at any point where the telegraph company may now or hereafter have an office separate from the railway company's office, by cutting rates or by active efforts to divert business from the telegraph company."

"*Twelfth.* It is further agreed that the management of the wires, the repairs of all the lines along the railway company's railroads, and the distribution of all materials for use on said lines, shall be under the supervision and control of a competent superintendent, who shall be appointed and paid jointly by the parties hereto, and whose salary shall be fixed by mutual agreement; and said superintendent shall be equally the servant of each of the

parties hereto, and shall, as far as practicable, protect and harmonize the interest of both parties hereto in the transaction of the railroad and commercial telegraph business along the railway company's railroads.

"*Thirteenth.* The railway company shall have the right to the free use of any telegraphic patent rights or new discoveries or inventions that the telegraph company now owns and uses in its general telegraph business, or which it may hereafter own and use as aforesaid, so far as the same may be necessary to properly carry on the business of railroad telegraphing on the line of said railroads as provided for herein.

"*Fourteenth.* The telegraph company hereby promises and agrees to assume and protect the railway company from the payment of all taxes levied and assessed upon the telegraph property belonging to either of the parties to this agreement."

The import of these various provisions is clear. They mean that the telegraphic business and the telegraphic franchise, in the sense we have defined it, should be exercised by the Western Union Telegraph Company, and that no other company—railway or telegraph—should touch it. The purpose was—a purpose disclosed by every section and line of the contract—that the public and commercial use of the telegraph wires should belong to the Western Union Company, leaving to the railroad company only so much use of the telegraph wires as was necessary for its own business. That such was the contemplation of the parties in this contract is evident, not only from its provisions, but from the actual workings subsequent thereto. The Western Union Company transacts the commercial business, and the railroad wires are used exclusively or substantially so for the railroad business. The telegraphic franchise is in fact separated from the railway company, and exercised by the Western Union Company. The telegraph superintendent of the railway company, Mr. Korty, says in his testimony that—

"The Union Pacific has four wires from Omaha to North Platte, and three from North Platte to Ogden. The other wires on the poles are used exclusively by the Western Union Company for commercial telegraph business. The three or four wires of the railroad company are entirely used by it for operating its roads. It would not be practicable to operate those wires for general commercial business without seriously interfering with the railroad business, and the railroad company's wires would be inadequate to carry any additional business."

Of similar effect is the testimony of J. J. Dickey, the western superintendent of the Western Union Company. The report made in 1889 to the interstate commerce commission by the comptroller of the Union Pacific Railway Company states that—

"The wires owned by the railway company are used for its railway business, and those owned by the telegraph company are used for commercial business."

In the bill filed immediately after the passage of the act of 1888 by the Western Union Telegraph Company against the Union Pacific Railway Company, in which an injunction was sought by the former against the latter to restrain any interference with the contract of 1881, it is alleged by the telegraph company, in paragraph 12, that—

"The said wires used by the defendant in the operation of its road are not equal to its necessities in that behalf, and it is impossible for it to do any

business for the public or other companies on said wires without seriously interfering with and impeding the operation of its engines, cars, and trains; and, if it undertakes to do so, it will be under the necessity of using your orator's five wires, or some of them. Upon your orator's said wires is carried on almost the entire transcontinental business of the Union. Nor can your orator submit to any interference therewith by the defendant or any other party without seriously impeding and disarranging that business to its great loss and the public's inconvenience."

And in the brief in this case the counsel for the Western Union Company, replying to one suggestion, say:

"This objection, however, is easily met by the fact that the railway company has, under the contract of 1881, employed us to operate its lines for commercial business, it reserving to itself their operation for railroad business."

Clearly, confessedly, then, the commercial business is transacted by the Western Union Company. If the contract be as suggested,—the mere hiring by the railway of the telegraph company to do this business,—there can be no doubt of the power of congress to put an end to such hiring, and to compel the corporation which it has created to employ other instrumentalities for doing the work. But I think the concession of counsel does not come quite up to the proof. The fact is, the commercial telegraph business is as fully in the hands and under the control of the Western Union Company as if the wires did not run along the right of way, and their working was wholly disconnected from the operation of the railroad; and this result was contemplated and intended by the contract. So it is that the lessons of experience support and establish the construction placed upon the contract of 1881, to the effect that the telegraphic franchise, as a franchise of independent, public, and commercial transportation, was intended to be and was transferred by the railway company to the Western Union Company, leaving only to the former so much use of telegraph wire as would facilitate and further its own railroad business. Summing it up in a word, the purpose and effect of that contract was and has been to transfer the full telegraphic franchise from the railway company to the Western Union Company. Such transfer was beyond the authority conferred by the acts of 1862 and 1864; and yet, to prevent any doubt, the government, in the exercise of its reserved power to alter and amend, by the act of 1888 in terms has commanded the railway company to exercise all the duties of its telegraphic franchise, and forbidden the performance of those duties by any other company, and through any other instrumentality than the direct servants and employes of the railway company.

As the contract of 1881 contemplates action distinctly forbidden by the act of 1888, two matters suggested by counsel for defendants seem excluded from consideration. It is insisted that the practical working of this contract is pecuniarily beneficial to the railway company, and also that the public interests are in fact subserved by placing the commercial telegraphic business along this road in the hands of that corporation which practically controls the telegraphic business of the country. Assume that both these contentions are sustainable, (and I am inclined

to believe that they are,) yet I am constrained to hold that, though established, they constitute no defense to the demand of the government. Take the first, and assume that the testimony establishes beyond question that the contract is pecuniarily beneficial to the railway company, that it earns more money by its continuance than it would by conducting through its own employes the commercial telegraph business, and yet may a court, by reason of this fact, decline to enforce the plain mandate of the government which created this corporation and gave it its powers? The government is, it is true, pecuniarily interested as second mortgagee, but a higher interest is that the administration of its franchises should redound to the general welfare, and not merely to the pecuniary interest of its grantee, or even of itself. The dollar is not always the test of the real interest. It may properly be sacrificed if anything of higher value be thereby attained. But whether the dollar be gained or lost, is not in a matter of this kind a question for the courts. It is for the legislative branch, as representative of the popular will, to settle all such questions. Given power to act in the legislature, and its mandatory action, the simple province of the courts is to enforce such mandate, and they have no revisory determination as to the wisdom or folly of the commanded act. In *U. S.* v. *Railroad Co.*, 91 U. S. 72, 91, this court, by Mr. Justice DAVIS, responding to a question of this kind, observed:

"Counsel have dwelt with special emphasis upon the consequences which would result from a decision adverse to the appellant. We cannot consider them in disposing of the questions arising upon this record. The rights of the parties rest upon a statute of the United States. Its words, as well as its reason, spirit, and intention, leave, in our opinion, no room for doubt as to its true meaning. We cannot sit in judgment upon its wisdom or policy. When we have interpreted its provisions, if congress has power to enact it, our duty in connection with it is ended."

So here I may not sit in judgment upon the financial wisdom or folly of this act of 1888. I may only inquire whether it is within the power of congress, and whether its enforcement infringes any vested rights of the defendants. That its enforcement may mean loss to either corporation, and loss to the government, does not determine the power of congress, or absolve the courts from the duty of enforcing its mandates.

And so with the other question. It may be true, as contended,—and, not disturbed by the common hue and cry about monopoly, I am disposed to believe that it is true,—that the real interests of the public are subserved by the consolidation of the various transportation systems, and that the putting into the hands and under the control of one corporation the telegraphic business of the country would secure to the public cheaper and better service. But, like the other, this is no question for the courts. This is a government of the people. They express their will through legislative action. It would disarrange our system of government, and would be freighted with peril, if the courts attempted to interpose their opinions upon matters of policy, to stay or thwart such constitutionally expressed judgment. It is enough for the courts to

protect and enforce rights, without entering into questions of policy. So, conceding in respect to these matters all that is claimed by counsel for defendants to be true, I am of opinion that they present no matters into which the court is at liberty to inquire, or which in any manner operate to prevent the enforcement of the declared will of congress in the act of 1888. Neither can there be any question in this case of the right of the government to maintain this bill. It was the creator of the railway corporation defendant, and a large contributor to its finances. It made absolutely a large grant of lands. It loaned its own bonds, and holds to-day a second mortgage. By reason of its governmental duty to regulate the affairs of this corporation, and also its pecuniary interest in their successful management, it may properly legislate in respect thereto, and invoke the aid of the courts to compel compliance with its determination. And when it is the complainant the inquiry is different and broader than when the corporations themselves are the contesting parties or when only individuals are challenging their action. The supervisory power of the government is plenary, and its commands to its corporate creations must be enforced, unless they trespass upon some vested rights of property.

The only remaining question which I deem important to consider is the objection made to the jurisdiction of a court of equity. It is urged that if a duty is cast upon these corporations, it must be enforced by *mandamus.* I had occasion to notice this question in the case of *Chicago, R. I. & P. R. Co.* v. *Union Pac. Ry. Co.,* 47 Fed. Rep. 15, and deem it unnecessary to add anything to my observations in that opinion. There is something to be considered beyond the mere mandate to obey the act of 1888. The Western Union Telegraph Company has property along the line of the railway company. The determination of its interests therein, protection against their sacrifice, and the securing of payment to it from the railway company are matters which cannot be settled by a court of law in proceedings in *mandamus.* A court of equity, with its flexible procedure, can alone meet all these exigencies. The jurisdiction of such a court seems to me necessary and unquestionable. A decree will therefore be entered in favor of the complainant, setting aside the contract of 1881, and putting an end to the relations created by and subsisting under it between the two defendants, and with it a mandatory injunction upon the railway company to hereafter, by its own agents and employes, and not through the instrumentality of the Western Union Company, exercise all the duties created by the telegraphic franchise of the acts of 1862 and 1864, and directing the latter company to vacate all the offices of the railroad company, with leave to the Western Union Company to apply for and have stated an account between it and the railway company, as to the value of its property along the line of the latter's railroads, and jointly used by the two companies, and for such other relief as equity and good conscience require.

MEMORANDUM. A copy of this opinion is sent to each of the counsel in the case. The counsel for the government can prepare a form of decree, and

submit it to the counsel for defendants; and, in case of disagreement as to the terms, it must be summitted to me with the suggestions of the parties, and no entry of record will be made till I have approved it.    I have purposely directed a decree which shall be final in character in order that an appeal may be taken, and the rights of the parties fully settled, before the labor and expense of accounting shall, if. finally ordered, be undertaken.