UNION PAC. RY. CO. et al. v. UNITED STATES.

(Circuit Court of Appeals, Eighth Circuit. January 29, 1894.)

No. 221.

1. RAILWAY AND TELEGRAPH COMPANIES—GOVERNMENTAL AID—PACIFIC RAILROADS.

There was nothing in the acts of July 1, 1862, and July 2, 1864, which would prevent the Union Pacific Railroad Company, in the discharge of its obligation to maintain a telegraph line for railroad and commercial purposes, from contracting with a telegraph company for the joint maintenance of a line of poles on the railroad right of way, upon which each party was to string its wires; the railroad company to maintain its own telegraphic offices and operators, adequate to the transmission of commercial, as well as railroad, messages. 50 Fed. 28, reversed.

2. SAME.

Such a contract was not rendered unlawful, on grounds of public policy, by a provision therein binding the railroad company to assure to the telegraph company the exclusive right of way along the railroad "as far as it could legally do so," and to refuse assistance and facilities for the construction of rival lines, in so far as "it could lawfully withhold" the same. 50 Fed. 28, reversed.

3. SAME.

The authority given to the Pacific Railroad Companies by the fourth section of the act of July 2, 1864, known as the "Idaho Act," to discharge their obligation in respect to telegraph lines by entering into

an arrangement with the United States Telegraph Company whereby its lines should be constructed upon their right of way, was not a privilege confined merely to the United States Company, but it extended to that company and "its associates," to whom the right of constructing lines was given in the first section of the act, and the railroad companies had authority to make such an "arrangement" with a company in which the United States Company became merged by a lawful consolidation. 50 Fed. 28, reversed.

4. SAME — ENFORCING RIGHTS OF GOVERNMENT — LEGAL AND EQUITABLE PROCEDURE.

The court will not presume, in the absence of express provisions to that effect, that, by directing the attorney general to take "proper proceedings" to ascertain and enforce the rights of the United States in the telegraphic property and franchises connected with the Pacific Railroads. (Act Aug. 7, 1888, § 4,) congress intended to authorize the joinder of legal and equitable matters in one proceeding; and it will not, therefore, under a bill in equity, attempt to enforce upon the Union Pacific Railroad Company the duty, imposed by the first section of said act, of operating its telegraph lines "by itself alone through its own corporate officer," which is a matter properly appertaining to the writ of mandamus. 50 Fed. 28, reversed.

5. SAME—INTERSTATE COMMERCE COMMISSION.

The duty of affording equal facilities to all connecting lines of telegraph without discrimination against any, which is enjoined upon the Pacific Railroad Companies by the second section of the act of 1888, is a duty to be enforced, not by a bill in equity, but in the manner prescribed in section 3, namely, by application to the interstate commerce commission under the rules prescribed by that body.

Appeal from the Circuit Court of the United States for the District of Nebraska.

In Equity. Bill by the United States against the Union Pacific Railway Company and the Western Union Telegraph Company to cancel a contract whereby the telegraphic franchises of the railroad company were transferred to the telegraph company, and to compel the railroad company to exercise such franchises directly through its own officers and employes. Complainant obtained a decree from the circuit court for the district of Nebraska, (50 Fed. 28,) but upon appeal the case was reversed, and the cause remanded with directions to set aside the former decree, and in lieu thereof to make and enter a modified decree.

This was a bill exhibited by the attorney general in behalf of the United States under the provisions of an act of congress approved August 7, 1888, (25 Stat. 382,) which by its title is declared to be supplementary to the Pacific Railroad acts of July 1, 1862, and July 2, 1864. Vide 12 Stat. 489, and 13 Stat. 356. The material portions of the act of August 7, 1888, are as follows:

"Be it enacted by the senate and house of representatives of the United States of America in congress assembled, that all railroad and telegraph companies to which the United States has granted any subsidy in lands or bonds or loan of credit for the construction of either railroad or telegraph lines, which, by the acts incorporating them, or by any act amendatory or supplementary thereto, are required to construct, maintain, or operate telegraph lines, and all companies engaged in operating said railroad or telegraph lines shall forthwith and henceforward, by and through their own respective corporate officers and employes, maintain and operate for railroad, governmental, commercial and all other purposes, telegraph lines, and exercise by themselves alone all the telegraph franchises conferred upon them and obligations assumed by them under the acts making the grants as aforesaid.

"Sec. 2. That whenever any telegraph company which shall have accepted the provisions of title sixty-five of the Revised Statutes shall extend its line to any station or office of a telegraph line belonging to any one of said railroad or telegraph companies, referred to in the first section of this act, said telegraph company so extending its line shall have the right and said railroad or telegraph company shall allow the line of said telegraph company so extending its line to connect with the telegraph line of said railroad or telegraph company to which it is extended at the place where their lines may meet, for the prompt and convenient interchange of telegraph business between said companies; and such railroad and telegraph companies, referred to in the first section of this act, shall so operate their respective telegraph lines as to afford equal facilities to all, without discrimination in favor of or against any person, company or corporation whatever, and shall receive, deliver and exchange business with connecting telegraph lines on equal terms, and affording equal facilities, and without discrimination for or against any one of such connecting lines; and such exchange of business shall be on terms just and equitable.

"Sec. 3. That if any such railroad or telegraph company referred to in the first section of this act, or company operating such railroad or telegraph line shall refuse or fail, in whole or in part, to maintain and operate a telegraph line as provided in this act and acts to which this is supplementary, for the use of the government or the public, for commercial and other purposes, without discrimination, or shall refuse or fail to make or continue such arrangements for the interchange of business with any connecting telegraph company, then any person, company, corporation, or connecting telegraph company may apply for relief to the interstate commerce commission, whose duty it shall thereupon be, under such rules and regulations as said commission may prescribe, to ascertain the facts, and determine and order what arrangement is proper to be made in the particular case, and the railroad or telegraph company concerned shall abide by and perform such order; and it shall be the duty of the interstate commerce commission, when such determination and order are made, to notify the parties concerned, and, if necessary, enforce the same by writ of mandamus in the courts of the United States, in the name of the United States, at the relation of either of said interstate commerce commissioners: provided, that the said commissioners may institute any inquiry, upon their own motion, in the same manner and to the same effect as though complaint had been made.

"Sec. 4. That in order to secure and preserve to the United States the full value and benefit of its liens upon all the telegraph lines required to be constructed by and lawfully belonging to said railroad and telegraph companies referred to in the first section of this act, and to have the same possessed, used and operated in conformity with the provisions of this act and of the several acts to which this act is supplementary, it is hereby made the duty of the attorney general of the United States, by proper proceedings, to prevent any unlawful interference with the rights and equities of the United States under this act, and under the acts hereinbefore mentioned, and under all acts of congress relating to such railroads and telegraph lines, and to have legally ascertained and firmly adjudicated all alleged rights of all persons and corporations whatever claiming in any manner any control or interest of any kind in any telegraph lines or property, or exclusive rights of way upon the lands of said railroad companies, or any of them, and to have all contracts and provisions of contracts set aside and annulled which have been unlawfully and beyond their powers entered into by said railroad or telegraph companies, or any of them, with any other person, company or corporation."

The Union Pacific Railway Company, which is named as one of the defendants in the bill, was formed in January, 1880, pursuant to section 16 of the act of July 1, 1862, by the consolidation of three pre-existing railroad corporations, to wit, the old Union Pacific Railroad Company, the Kansas Pacific Railway Company, and the Denver Pacific Railway & Telegraph Company. The consolidated company now operates a line of railroad from Council Bluffs, Iowa, to Ogden, Utah, known as the main line; also, a line

from Kansas City, Mo., to Denver, Colo., and a line from Denver north to a junction with the main line at Cheyenne. Prior to the consolidation in January, 1880, the Union Pacific Railroad had built the main line from Council Bluffs to Ogden, together with a line of telegraph along its right of way; the Kansas Pacific Railway Company (which was first called the Leavenworth, Pawnee & Western Railroad, subsequently the Union Pacific Railroad, Eastern Division, and lastly the Kansas Pacific Railway Company) had built the line of railroad from Kansas City to Denver, and under a contract with the Western Union Telegraph Company of date October 1, 1866, had caused a line of telegraph to be erected on its right of way. Prior to the consolidation the Denver Pacific Railway & Telegraph Company had built a line of railroad and telegraph from Denver to Cheyenne, acting in that behalf under a contract with the Kansas Pacific Railway Company, whereby the former company acquired so much of the Kansas Pacific Company's subsidy as pertained to that part of its line between Denver and Cheyenne. The contract between the two companies, last mentioned, was authorized by an act of congress approved on March 3, 1869, (15 Stat. 324.) The Leavenworth, Pawnee & Western Railroad Company (afterwards termed the Kansas Pacific Railway Company) accepted the provisions of the ninth section of the Pacific Railroad acts of July 1, 1862, and July 2, 1864, which acceptance entitled it to receive, and it did in fact receive, a large subsidy from the government for constructing the line of railroad from Kansas City to Cheyenne via Denver, and the Union Pacific Railroad Company received a like subsidy for building the main line from Council Bluffs to Ogden.

The foregoing facts were stated substantially in the bill of complaint. It further charged, in substance, as follows: That by the act of July 1, 1862, the Union Pacific Railroad Company became and was bound to build and maintain, and to operate by its own servants and agents, a line of telegraph for commercial and governmental purposes between Omaha and Ogden, but that on September 1, 1869, and on December 20, 1871, said railroad company had unlawfully leased to the Atlantic & Pacific Telegraph Company "all its telegraph lines, wires, poles, instruments, and offices, and all of its property pertaining to the business of telegraphy," for the full period of its corporate existence; and that the consolidated company had thereafter, on July 1, 1881, entered into a contract with the Western Union Telegraph Company (which had, in the mean time, become the successor of the Atlantic & Pacific Telegraph Company) whereby it had "surrendered its franchise and alienated its powers under its charter" to said Western Union Telegraph Company, and that under said contract the Western Union Telegraph Company had entered into possession and control of the lines of telegraph between Omaha and Ogden. The bill also charged that under the provisions of the Pacific Railroad acts of July 1, 1862, and July 2, 1864, the United States had a lien upon the railway and telegraph lines aforesaid, and the earnings of each, with all appurtenances, to reimburse it for aid extended in constructing the same, but that the Union Pacific Railway Company, by the contract of July 1, 1881, with the Western Union Telegraph Company, had "attempted to relieve itself from the duty of maintaining and operating telegraph lines for railroad, governmental, commercial, and all other purposes, and had refused to exercise the obligations assumed by it under the aforesaid acts;" that the United States "had been deprived by said contract of its security and indemnity fund;" that the earnings from said telegraph business had been appropriated by the Western Union Telegraph Company, which had taken possession, for its own use, of the right of way and materials donated by the United States; that the Union Pacific Railway Company "had surrendered its telegraphic franchises to the telegraph company;" that it "had avoided and refused to perform its duties; that it had refused to connect with other lines, or to afford any facilities for the exchange of telegraph business except with the Western Union Telegraph Company; that it had refused to do any telegraph business for the United States or for the general public, and had thereby granted a monopoly of the telegraph business along its lines to the Western Union Telegraph Company, and had deprived the people of the United States of the benefits of free competition, contrary to the Pacific Railroad acts aforesaid and the

supplementary act of August 7, 1888. The bill further averred that since the passage of the act of August 7, 1888, the Union Pacific Railway Company had continued to act in accordance with the provisions of the contract of July 1, 1881, and that it had done so, subsequent to the passage of that act, under pretense of complying with an injunction which the Western Union Telegraph Company had obtained on February 14, 1889, in the United States circuit court for the district of Nebraska, restraining the Union Pacific Railway Company "from doing any act or thing contrary to the provisions of that contract." The bill of complaint disclosed the various proceedings that had been taken in said injunction suit, (which is characterized as a collusive suit,) and among other things averred, in substance, that it was therein claimed by the Western Union Telegraph Company that prior to October 1, 1866, the United States Telegraph Company had moved its telegraph line in the state of Kansas upon the right of way of the Kansas Pacific Railway Company under an arrangement with the Kansas Pacific Railway Company which was authorized by an act of congress approved July 2, 1864, (13 Stat. 373;) that the Western Union Telegraph Company had succeeded to all the rights of the United States Telegraph Company, and on October 1, 1866, had entered into a contract with the Kansas Pacific Railway Company, in pursuance of which it had completed the line of telegraph along the Kansas Pacific Railway to Denver, and that the line so constructed was duly accepted by the United States as a fulfillment of the obligation of the Kansas Pacific Railway Company to erect a line of telegraph. With respect to this claim on the part of the Western Union Telegraph Company, the bill filed by the United States charged, in substance, that the United States Telegraph Company did not remove its constructed line, under the aforesaid arrangement, upon the right of way of the Kansas Pacific Railway Company; that the Western Union Telegraph Company did not complete a line of telegraph along that road to Denver, as claimed; and that the United States had neither accepted such line of telegraph from the Western Union Telegraph Company, nor dealt with nor recognized either it or the United States Telegraph Company as the builder of said line. The bill finally charged that all of the aforesaid contracts with the Western Union Telegraph Company were beyond the power of the railway company to make, and against public policy, and in violation of the Pacific Railroad acts and the act of August 7, 1888.

The prayer of the bill was in accordance with the fourth section of the act of August 7, 1888: "That the court ascertain and finally adjudge the rights of all persons and corporations in any manner claiming any contract or interest of any kind in said telegraph lines or property, or exclusive rights of way upon the lands of said railway company, or any of them, and that upon the hearing an order or final decree be entered, canceling and annulling said contract and all provisions of contracts relating to the alienation of said telegraph lines or the control and management thereof," and that said railway company "be decreed and compelled to maintain and operate said telegraph lines according to law." Answers were filed by the railway company and the telegraph company, which admitted the execution of the several contracts referred to in the bill, but denied that the contracts of July 1, 1881, and October 1, 1866, were invalid. The defendants further denied, in substance, that the railway company had transferred or surrendered its telegraphic franchise to the telegraph company, or that it had divested itself of the power to perform its charter obligations to the government or to the public with respect to maintaining a telegraph line, or that it had at any time failed or refused to discharge its obligations in that behalf. On the final hearing the circuit court entered a decree canceling and annulling all of the contracts with the Western Union Telegraph Company and the Atlantic and Pacific Telegraph Company that have been heretofore referred to. It further decreed that the Union Pacific Railway Company "put an end to all relations with the Western Union Telegraph Company not equally allowed to other persons and corporations operating * * * telegraphs, that it at once resume possession of its offices, poles, wires, instruments, and all of its other property belonging to the business of telegraphy, along such of its main and branch lines as were aided by the government under

the act of July 1, 1862, * * * and henceforth, by and through its own corporate officers and employes, maintain and operate for railroad. governmental, commercial. and other purposes such telegraph lines and instruments, and * * * exercise, by itself alone, all the telegraphic franchises conferred upon it under the several acts granting to it subsidies." The decree further required the railway company to afford equal facilities to all telegraph companies without discrimination, and to receive. deliver, and exchange business with connecting telegraph companies on equal terms, and to afford equal facilities to all. without discrimination for or against any. It further commanded the railway company to construct and provide such lines of telegraph and instrumentalities as would be adequate to enable it to carry out the provisions of the decree aforesaid, and also commanded the Western Union Telegraph Company to forthwith vacate all offices of the railway company without removing therefrom, until further order. any property which had theretofore been jointly used by the two defendants.

The opinion of the circuit court is reported in 50 Fed. 28, 41.

John F. Dillon and John M. Thurston, (W. R. Kelly, on the brief,) for appellant Union Pac. Ry. Co.

Rush Taggart, for appellant Western Union Tel. Co.

Sol. Gen. Maxwell, for the United States.

Before CALDWELL, Circuit Judge, and THAYER, District Judge.

THAYER, District Judge, after stating the case as above, delivered the opinion of the court.

The chief question to be considered on this appeal is whether the United States is entitled to have the contract of July 1, 1881, between the Union Pacific Railway Company and the Western Union Telegraph Company, canceled and annulled, either because it was originally illegal and beyond the power of the Union Pacific Railway Company, or because its provisions are now repugnant to the act of August 7, 1888, (25 Stat. 382.) Subordinate to this general inquiry are the questions whether the contract of October 1, 1866, between the Western Union Telegraph Company and the Kansas Pacific Railway Company, is invalid, and some questions pertaining to the scope, purpose, and effect of the act of August 7, 1888. It is claimed by the government, and is not denied by the appellants, that the Pacific Railroad acts of July 1, 1862, and July 2, 1864, imposed on the various constituent railroad companies who now compose the Union Pacific Railway Company the duty, among others, of constructing and maintaining on their several rights of way a line of telegraph for governmental, commercial, and other purposes. It was held both by Mr. Justice Brewer in this case, and by Mr. Justice Miller and Judge McCrary in other cases where the same question was involved, that the obligation thus imposed on the several railroad companies to construct and maintain telegraph lines could not be lawfully avoided by leasing their lines of telegraph, after their construction, to some other corporation, to be by it maintained and operated. Vide 50 Fed. 32; W. U. Tel. Co. v. Union Pac. Ry. Co., 3 Fed. 423, 721, 725; Atlantic & P. Tel. Co. v. Union Pac. Ry. Co., 1 Fed. 745, 749. This latter proposition does not seem to be controverted by the appellants, or either of them; therefore, it must be taken as conceded that the lease granted by the Union Pacific Railroad Company to the Atlantic & Pacific Tele-

graph Company on September 1, 1869, and the supplementary agreement of December 20, 1871, between the same companies, which are referred to in the bill of complaint, were each beyond the power of the railroad company to execute, and for that reason were and are of no binding force or efficacy. The nineteenth section of the Pacific Railroad act of July 1, 1862, (12 Stat. 489,) and the fourth section of the act of July 2, 1864, (13 Stat. 373,) provided a means by which the old Union Pacific Railroad Company and the Kansas Pacific Railway Company might respectively relieve themselves of the obligation to construct and maintain a telegraph line along their respective rights of way. When the act of July 1, 1862, was passed, the Pacific Telegraph Company, the Overland Telegraph Company, and the California State Telegraph Company were operating a line of telegraph across the plains, from the Missouri river to San Francisco, about on the proposed route of the main line of the Union Pacific Railway Company, under a contract with the government which had been entered into pursuant to an act of congress approved June 16, 1860, (12 Stat. 41,) entitled "An act to facilitate communication between the Atlantic and Pacific states by electric telegraph." The nineteenth section of the act of July 1, 1862, provided, in substance, that an arrangement might be made with said last-named telegraph companies, by the railway companies mentioned in said act, to move their line of telegraph upon the railroad right of way, and that, if such an arrangement was entered into, it should be considered a fulfillment of the obligation of the railroad company to construct and maintain a line of telegraph; and, even in the absence of such an arrangement, it authorized the aforesaid telegraph companies to move their line upon the railroad right of way. In like manner the fourth section of the act of July 2, 1864, which latter act empowered the United States Telegraph Company to construct a telegraph line between the Missouri river and San Francisco, authorized the United States Telegraph Company to enter into an arrangement with either of the railway companies mentioned in the Pacific Railroad act of July 1, 1862, whereby its telegraph line might be erected on the railroad right of way, and, if so erected, should be held and considered a fulfillment of the railroad company's obligation to construct and maintain a telegraph line. This latter act, though general in its terms, evidently had in view an arrangement between the United States Telegraph Company and the Kansas Pacific Railway Company, whereby the latter should be relieved of its telegraphic obligation, as the line of the United States Telegraph Company was projected to run through Kansas. With respect to the opportunity thus afforded to the several railway companies to fulfill their telegraphic obligations to the United States otherwise than by actually constructing and maintaining a telegraph line for governmental and commercial purposes, it is sufficient to say, that it does not appear to be claimed by the appellants, or either of them, that the old Union Pacific Railroad Company ever availed itself of the opportunity thus afforded it, so far as the main line between Omaha and Ogden is concerned. On the contrary, it built a telegraph line of its own, on the

north side of its right of way, between the points aforesaid, and the three telegraph companies heretofore named (the Pacific, the Overland, and the California State) moved their line upon the south side of the right of way, in accordance with the statute aforesaid, but not under any such "arrangement" or agreement with the railway company as would suffice to relieve the latter of its obligation to maintain a telegraph. The case is different, however, with respect to the Kansas Pacific Railway Company. It is argued with much force that the latter company entered into an arrangement with the United States Telegraph Company, which arrangement was subsequently embodied in the contract of October 1, 1866, with the Western Union Telegraph Company, the successor of the United States Telegraph Company, whereby, under the fourth section of the act of July 2, 1864, supra, it fulfilled its obligation to maintain a telegraph line at least between Kansas City and Denver. We shall discuss the merits of this contention further on, but at present, with the foregoing summary of the points conceded, and in the light of such concessions, we turn to consider whether the contract of July 1, 1881, which superseded all other contracts, was a valid agreement.

Before stating the provisions of that contract it will be well to describe the situation as it existed when the same was entered into. At that time the Western Union Telegraph Company, as the successor of the Overland, the Pacific, and the California State Telegraph Companies, was lawfully in possession of, and was the owner of a line of telegraph upon the railroad right of way between Omaha and Ogden. The Western Union Telegraph Company had in fact furnished the means to build, and had built, that line of telegraph across the plains, and had caused it to be moved upon the railroad right of way, through the agency of the three telegraph companies last named. On July 1, 1881, the Western Union Telegraph Company had also succeeded to all the rights of the Atlantic & Pacific Telegraph Company, which was the lessee of the Union Pacific's telegraph line under the lease of September 1, 1869. In a suit which had theretofore arisen between the Atlantic & Pacific Telegraph Company and the Union Pacific Railway Company it had been decided that the last-mentioned lease was invalid; but, as it appeared in the course of the suit that the railway company had received for such lease 17,800 shares of the telegraph company's stock, from which it had realized from four to six hundred thousand dollars, the court had enjoined the railway company from taking possession of the telegraph line then in the possession of the Atlantic & Pacific Telegraph Company under the invalid lease until there had been an accounting, and until the consideration for the lease had been restored. Vide 1 Fed. 745, 752. This injunction was in full force on July 1, 1881. The railway company did not have possession of the telegraph line between Council Bluffs and Ogden, and could not acquire possession of that line except on the condition last indicated. Prior to July 1, 1881, litigation had also arisen with respect to the telegraph line on the right of way of the Kansas Pacific Railway Company. The Union Pacific Railway Company, after the con-

solidation, had threatened to take possession of that line, which had been erected and was being operated by the Western Union Telegraph Company under the contract of October 1, 1866, with the Kansas Pacific Railway Company, heretofore mentioned. The Western Union Telegraph Company had applied for and obtained an injunction against the railway company to restrain its threatened action. With reference to that litigation it is sufficient to say, at present, that on July 1, 1881, the injunction was in full force, but under conditions which permitted the railway company to have the exclusive use of one wire between Kansas City and Denver for railroad and commercial business. Vide 3 Fed. 417, 423, 721, 736.

In this posture of affairs the contract of July 1, 1881, was executed. As the contract is lengthy, we shall only undertake to state its material provisions, and according to their legal effect, rather than in the language of the parties. It recites, in the first instance, that it is entered into "for the purpose of providing telegraphic facilities for the parties thereto, and maintaining and operating the lines of telegraph along the Union Pacific Railway in the most economical manner, in the interest of both parties, and for the purpose of fulfilling the obligations of the railway company to * * * the United States and the public in respect to the telegraphic service required by the act of congress of July 1, 1862, and the amendments thereto." The parties then agreed, in substance, as follows: That all existing suits (being those heretofore mentioned) should be dismissed, and that the contract should operate as a release and discharge of all claims, debts, and liabilities arising and accruing under pre-existing contracts between the parties, which were then in litigation; that the railway company should assure to the telegraph company, as far as it legally could do so, the exclusive right of way along its railroad, and any extensions and branches thereof, for the construction and maintenance of lines of telegraph, and that the railway company would not transport men and material for the construction of a line or lines of telegraph to be operated in competition with the Western Union Telegraph Company, except at its regular local rates, nor furnish such competing lines facilities for construction that it could lawfully withhold, nor stop its trains or distribute material at other than regular stations; that no employe of the railway company should be employed by, or have any connection with, any other telegraph company than the Western Union Company; and that the latter company should have the exclusive right, as against any other telegraph company, to occupy and connect with the railway company's depots or station houses for commercial telegraph purposes. Concerning the mode of keeping up, maintaining, and renewing the existing lines of telegraph then on the railroad right of way, the contract contained the following stipulations: That the railway company should, at its own expense, furnish all the labor in that behalf required, except a foreman; that the telegraph company should provide a foreman, skilled in the work of construction and repair, to direct and supervise such work; and that each party should pay one-half the cost of poles, wire, insulators, tools, and other materials used for the

maintenance, renewal, or repair of telegraph lines along all of the railway company's roads, branches, and extensions, until three wires for the exclusive use of each party had been provided between Council Bluffs and Ogden,—two for the exclusive use of each party between Kansas City and Denver, and one for the exclusive use of each party on all other portions of the railway company's road. The contract in this respect further provided that the railway company should transport free of charge, and distribute along the line of its railroad, all poles and other materials that were required in the work of maintenance, renewal, and reconstruction, also all employes and laborers who were engaged in such work, and that the telegraph company, on its part, should supply telegraph instruments and local batteries to work the line, and blanks and stationery for commercial telegraph business. With respect to the mode of operating the telegraph lines aforesaid, the contract contained the following provisions: That at all telegraph stations of the railway company its operators should receive and transmit such commercial or public messages as were offered, and should account for the tolls paid thereon to the telegraph company, but that at the end of each month the telegraph company should return to the railway company one-half of such receipts at its offices, excepting only tolls paid on ocean cable messages and tolls paid for the transmission of messages over other lines of telegraph than Western Union lines; that the telegraph company should also furnish, free of charge, one wire between Omaha and Kansas City, over which the railway company might transact its railroad business between those points and at intermediate places on the Missouri river, including Council Bluffs; that either party might maintain offices along the Union Pacific Railway where they then had offices, and might establish additional offices, but that the telegraph company should not establish independent offices at any point along said railroad within one mile of an office previously established by the railway company unless the latter company consented, and that the railway company's operators should not compete with the telegraph company at points where the latter maintained independent offices, by cutting rates, or by active efforts to divert business from the telegraph company. It was further stipulated by the parties as follows: That if any person, or officer of the government, tendered a message to a railway telegraph operator at any station between Council Bluffs and Ogden, and required its transmission over the wires of the railway company, it should be so sent, at rates fixed by the railway company. It was also stipulated, in substance, that in addition to the three wires between Council Bluffs and Ogden, and the two wires between Kansas City and Denver, and the one wire on other portions of its road, which were to be set apart, or were to be strung and maintained, for the exclusive use of the railway company, the railway company might string such other wires for its exclusive use, and at its own cost, as it saw fit; and the like privilege was accorded to the telegraph company. It was also stipulated that a competent superintendent of the telegraph lines aforesaid should be appointed by the railway and telegraph companies, and that both should contribute to pay

for his services.  The foregoing contract was to continue in force for 25 years, and was to supersede all previous contracts relating to said telegraph lines, including the contract of October 1, 1866, between the Western Union Telegraph Company and the Kansas Pacific Railway Company, but it was agreed that if the contract of July 1, 1881, was not kept in good faith by the railway company, then the superseded contracts should be revived and considered in force. Since the foregoing agreement was entered into, and in accordance with its provisions, the lines of telegraph formerly erected on the railway company's right of way between Omaha and Ogden have been entirely reconstructed in a very substantial manner, and at great cost to the parties.  In the process of reconstruction, all of the wires have been strung on a new line of poles erected on the north side of the right of way, a portion of which wires are exclusively used by the railway company and the remainder by the telegraph company.  Some of the telegraph company's wires connect with the depots and station houses of the railway company, but many of its wires run into independent offices of the telegraph company, and are not so connected.

It is claimed by the United States (and this contention seems to have prevailed in the circuit court) that this contract was originally beyond the power of the Union Pacific Railway Company, and therefore invalid, because the railway company thereby transferred or surrendered its telegraphic franchise to the Western Union Telegraph Company, and disabled itself to discharge its obligations to the government and the public; secondly, that the contract is in restraint of trade and against public policy, and for that reason is illegal and void.

With reference to this contention it should be remarked, at the outset, that when the contract of 1881 was executed, and long prior thereto, the Western Union Telegraph Company was lawfully in possession of a line of telegraph on the railroad right of way, and was operating the same for commercial and other purposes.  It was there with the express sanction of congress under the nineteenth section of the act of July 1, 1862, and neither acquired nor claims to have acquired its right to operate its existing wires under the said contract.  Looking at the provisions of the agreement, it is also noteworthy that it imposes no limitations or restrictions upon the right of the railway company to operate a telegraph for commercial, governmental, and other purposes.  It has wires which are devoted to its exclusive use, telegraphic offices at convenient points along its road, operators to work its wires, who are expressly required to send over the same all such messages of a governmental or commercial character as are directed by the senders to be so sent, and the right to string such additional wires as may at any time be deemed essential or convenient to meet the demands made upon it for telegraphic service.  It surely cannot be maintained that in addition to the foregoing facilities the railway company must maintain a separate line of poles on its right of way and at its own expense, for when congress authorized other telegraph companies to go upon this right of way, as it did by the act of July 1, 1862, and

again by the act of July 24, 1866, (14 Stat. 221,) it must have foreseen that it would be convenient, economical, and often necessary for such companies and the railway company to string their wires on the same poles, and we will not impute to congress an intention to ignore all considerations of convenience and economy, especially in view of the magnitude and importance of the enterprise which it aimed to foster. We may well take judicial notice of the fact that there is no inherent difficulty in stringing several independent lines of telegraph on the same poles. That method of construction in no wise interferes with the efficiency of lines that are so built, while it is often a convenient, and always an economical, arrangement. We think, therefore, that the Pacific Railroad acts did not impose on the railway company the duty of maintaining a separate line of poles upon which to string its wires, and that its failure to do so cannot be regarded as any evidence of an abandonment of its public duties.

Perhaps the strongest evidence of an intent on the part of the Union Pacific Railway Company to part with its telegraphic franchise is to be found in those provisions of the contract whereby the telegraph company gained access to the railway company's station houses with some of its wires, and the right to avail itself of the services of employes of the railway company; but on a careful scrutiny it will be seen that the most that can be alleged against these provisions is that they afforded to the telegraph company some facilities for competing with the railway company in the matter of transacting a commercial business, which it would not have enjoyed if it had been compelled to maintain independent offices at all of such points, and to man them with its own operators. These provisions cannot be said to have amounted to a transfer or surrender of the telegraphic franchise, because, notwithstanding these provisions, the railway company still retained its right and capacity to do a commercial business. Moreover, it does not occur to us that there are any provisions in the Pacific Railroad acts which made it the duty of the railway company to withhold from any telegraph company that was authorized to occupy its right of way any facility for the convenient and economical operation of its line, merely because it would enable such company to compete more successfully with the railway company in the transaction of a telegraph business. Congress had offered to relieve the railway company of the entire burden of constructing and maintaining a telegraph line, if it would arrange with one of these telegraph companies to move its line upon the railroad right of way. When those acts were passed, congress was desirous, above all things, to have a telegraph line constructed across the plains that would be able to render cheap, prompt, and efficient service both to the government and the public. This purpose is manifest throughout all of the legislation of congress, which antedates the contract of 1881, and for that reason we cannot hold the provisions of the contract now in question to be unlawful merely because they gave the telegraph company better opportunities for successful competition. We think it obvious that they

enabled both the railway company and the telegraph company to operate their lines more economically, and to render the public better service, without impairing the franchise of either.

Much stress, however, is laid on the fact that under the operation of the contract the great bulk of the commercial telegraph business over the lines in question is done by the Western Union Company. Attention is also directed to the circumstance that the wires devoted to the use of the railway company are about sufficient to do its ordinary railroad business, and are wholly insufficient to do a considerable portion of the commercial business. With reference to the last of these suggestions it is sufficient to say that the record does not disclose that the railway company has ever failed or refused to transmit over its own wires a single governmental or commercial message which was tendered it to be so sent. The wires which it operates seem to be adequate for its patronage, and under no possible construction of its charter can it be held bound to furnish more wires than are needed to meet the demands made upon it for telegraphic service. But it is said that its loss of patronage is due to the contract with the telegraph company, and that what has actually occurred under the operation of that contract is persuasive evidence of what was intended to happen, and that it should control in determining the purpose of the parties thereto and the true interpretation of the agreement. We entertain no doubt that the bulk of the commercial business, as claimed, is in the hands of the Western Union Telegraph Company; that fact is abundantly shown by the record, and is practically admitted by the appellants. But we are unable to concede that the fact last mentioned is mainly due to the operation of the contract of 1881, or that it should be accepted as a safe test by which to determine the legal effect of that agreement. It is not a necessary inference that the failure of the railway company to secure a fair share of the commercial telegraph business is due to the existence of the contract; much less does it follow that, because the Western Union Telegraph Company now transacts the great bulk of the commercial telegraph business, the railway company has therefore parted with its telegraphic franchise, and disabled itself from fulfilling its public duties. The telegraph company is engaged exclusively in operating lines of telegraph for commercial and other purposes. Its wires ramify throughout the United States, and reach every important city and hamlet, while the railway company is limited to the lines erected on its right of way, and must depend upon connecting lines for the transmission of all dispatches that are not purely local. In view of this fact it becomes highly probable that, under the operation of natural laws of trade, the same disparity in the business of the two companies would in any event exist, because of the superior facilities of the telegraph company for reaching distant points, and forwarding messages intrusted to it with promptness and accuracy. At all events, we cannot regard the existing disparity in the amount of commercial business done by the respective companies as of much importance in deciding whether the contract was be-

yond the power of the railway company. That issue must be determined by ascertaining what power to transact a commercial telegraph business the railway company still retains, and what functions it has abdicated; in other words, the question must be decided with reference to the provisions of the contract, rather than with reference to a business condition that now exists, which may be, and probably is, due to natural causes. Midland Ry. Co. v. Great Western Ry. Co., 8 Ch. App. 841, 854.

The result of our deliberations on this branch of the case has been that we are unable to declare the contract of 1881 to be beyond the power of the railway company because it divests the company of its telegraphic franchise, or because it renders it powerless to discharge its public duties. In our judgment, the Union Pacific Railway Company has now the same absolute power to operate a telegraph line for commercial and other purposes that it ever had. Under the contract in question it secured at once the absolute control of several lines of wire, with authority to use them for all purposes, and the right to string any number of additional wires, and to use them as it saw fit. By the provisions of the agreement it also avoided a litigation of vast proportions and great intricacy in which it was then involved, touching its right to the lines of telegraph on its right of way, and at the same time it was relieved of its liability to account for large sums of money which it had received from the Atlantic & Pacific Telegraph Company under the invalid lease of September 1, 1869. From the standpoint of the railway company it was confessedly a beneficial business arrangement, by means of which it has realized great advantages in which the government has participated; and the record before this court fails to disclose that the general public have been prejudiced by the manner in which the lines of telegraph in question have been maintained and operated under the provisions of the agreement. We would not be understood as intimating that the considerations last mentioned should have any weight if the contract was in fact contrary to law; but they furnish an adequate reason why it should not be set aside and canceled, unless it appears that it was clearly beyond the power of the railway company to enter into such an arrangement.

The other objection to the contract of 1881, which has been heretofore mentioned, is based on those provisions of the agreement whereby the Western Union Telegraph Company attempted to obtain certain exclusive rights and privileges from the Union Pacific Railway Company, and to prevent other telegraph companies from coming upon the railroad right of way. These stipulations are said to have rendered the contract voidable on grounds of public policy. When the contract was executed, the railway company appears to have entertained doubts of its power "to assure to the telegraph company the exclusive right of way along and upon its line of road;" hence it agreed to grant such exclusive right only to the extent that it might legally do so. The further provision in the contract relative to withholding facilities for the construction of competing

lines of telegraph was also accompanied with the reservation that it should only be required to refuse to afford such assistance and facilities as it might lawfully withhold. It may be admitted that these provisions of the contract would have been unlawful, as the law is now understood, if the railway company had bound itself absolutely to exclude other telegraph companies from its right of way, or to withhold all facilities for the construction of competing lines. W. U. Tel. Co. v. American Union Tel. Co., 65 Ga. 160. But, as these stipulations were actually drawn, they neither bound the railway company to do anything that was unlawful or contrary to its duty. The most that can be alleged against them is that they placed the railway company in a position in which it might be compelled to determine, at its peril, whether, by extending certain facilities and assistance to competing lines, it would thereby violate its contract with the telegraph company; but this is an attitude in which the parties to contracts are frequently placed. The only exclusive privileges that the telegraph company acquired by this contract, so far as we are able to see, was the right to connect its wires with the railway company's station houses and to maintain offices therein; also, the right to have the wires thus connected with such stations operated by employes of the railway company, and the right, under the ninth clause, to have poles and telegraph materials transported and distributed free of charge along the Union Pacific Railway. For all of these privileges the railway company undoubtedly received what it deemed an adequate consideration in the way of advantages derived from other provisions of the contract, and the privileges in question do not appear to us to be of such nature that the railway company was bound, either under then existing acts of congress or on general principles of law, to confer them equally upon all other telegraph companies. Express Cases, 117 U. S. 1, 6 Sup. Ct. 542, 628; Pullman's Palace-Car Co. v. Missouri Pac. Ry. Co., 115 U. S. 587, 6 Sup. Ct. 194. Under the second section of the act of congress of August 7, 1888, enjoining upon the railway company the duty of affording equal facilities to all without discrimination, the privileges aforesaid may most likely be claimed by all telegraph companies who comply with the provisions of the last-mentioned act, and they can no longer be regarded as exclusive; but we think it must be conceded that, when the contract was executed, the railway company had some power to enter into arrangements with other telegraph companies with a view of making a profitable use of its telegraphic franchise, and that within this power was the right to select some telegraph company, and to confer upon it special privileges, like those above mentioned, in exchange for benefits and advantages which it could by such means secure. We will not impute to congress the folly of having granted to the railway company a telegraphic franchise, and of having so limited the power to exercise it or deal with it as to render it a burden rather than a benefit. In the nature of things, some power must be conceded to the railway company to enter into arrangements with other telegraph companies to assure the economical maintenance and profitable working of its lines, and we think that the grant of the

exclusive privileges above referred to was not an unreasonable nor an unlawful exercise of that power.

Passing, now, to the contract of October 1, 1866, between the Kansas Pacific Railway Company and the Western Union Telegraph Company, it should be observed, that the necessity of noticing that contract, which has been superseded, for the time being, by the contract of 1881, grows out of the fact that it was annulled by the decree of the circuit court, whereas the appellants claim that it was lawfully entered into under the fourth section of the act of July 2, 1864, and operated to relieve the railway company of its obligation to maintain a telegraph line along the railroad right of way between Kansas City and Denver. Hence, it becomes an important inquiry whether that contract was rightfully annulled. The act of July 2, 1864, last referred to, is entitled "An act for increased facilities of telegraphic communication between the Atlantic and Pacific states and the territory of Idaho." 13 Stat. 373. Its first section declared "that the United States Telegraph Company and their associates, are hereby authorized to erect a line or lines of magnetic telegraph between the Missouri river and the city of San Francisco, * * * on such route as they may select, to connect with the lines of the said United States Telegraph Company now constructed and being constructed through the states of the Union." By the same section the company was given the right to use unoccupied land of the United States for right of way, materials, station houses, etc. The second section granted said company the right to erect a line of telegraph from Ft. Hall to Portland, Or., via San Francisco, and from Ft. Hall to Bannock and Virginia City. The third section granted to the company the right to send dispatches over any line then or thereafter built by authority of congress, to connect with any lines erected by the Russian or English governments. The fourth and last section was as follows:

"Sec. 4. The several railroad companies authorized by act of congress, July one, eighteen hundred and sixty-two, are authorized to enter into arrangements with the United States Telegraph Company so that the line of telegraph between the Missouri river and San Francisco may be made upon and along the line of said railroad and branches as fast as said roads and branches are built, and if said arrangements be entered into, and the transfer of said telegraph line be made in accordance therewith to the line of said railroad and branches, such transfer shall, for all purposes of the act referred to, be held and considered a fulfillment on the part of said railroad companies of the provision of the act in regard to the construction of a telegraph line; and, in case of disagreement, said telegraph company are authorized to remove their line of telegraph along and upon the line of railroad therein contemplated, without prejudice to the rights of said railroad companies."

Now, the contract of October 1, 1866, provided, in substance, for the erection of a line of telegraph on the railroad right of way from Lawrence, Kan., to Denver, Colo., at the joint expense of the telegraph company and the railway company, and for their joint use, but the railway company was denied the right to transact a commercial telegraph business over that line. Before this contract was entered into, a small portion of the line between Lawrence and Denver had been wholly or partially constructed by the United States

Telegraph Company, under an arrangement with the railway company for its joint use, and it seems evident that the agreement of October 1, 1866, was entered into with the Western Union Telegraph Company because, by consolidation proceedings, it had then become the successor of the United States Telegraph Company. It seems most probable, we think, that the contract of October 1, 1866, was intended to give expression, in a more detailed form, to an oral understanding or agreement which had previously existed between the Kansas Pacific Railway Company and the United States Telegraph Company, and it admits of no doubt that, in accordance with the terms of that contract, a line of telegraph was completed through to Denver. After a very full consideration of the question it was held by Mr. Justice Miller, as far back as 1880, in the case of W. U. Tel. Co. v. Union Pac. Ry. Co., 3 Fed. 721, 727, 728, that the contract of October 1, 1866, embodies such an "arrangement" as was contemplated and authorized by the fourth section of the act of July 2, 1864, above quoted, and such an "arrangement" as, if carried out, would absolve the railway company with which it was made from the obligation to construct and operate an independent line of telegraph. The court said in that case that "it was manifestly the design of the act of 1864 to enable the United States Telegraph Company to become substituted, by a proper arrangement with the Pacific Railroad Company and its branches, to the right to build a telegraph line along the * * * right of way of those railroad companies, and thereby to relieve those companies from the obligation to build and operate such a line." It furthermore said, in substance, that the contract of 1866 satisfied all the requirements of the act of July 2, 1864, notwithstanding the fact that it prohibited the railway company from transmitting commercial messages. In that case, however, the evidence then before the court did not disclose whether the Western Union Telegraph Company was in fact the legal successor of the United States Telegraph Company, and that point was left undetermined, with the statement, however, that the contract of 1866 was clearly valid if such successorship was thereafter established.

On the trial of the present case Mr. Justice Brewer held, in effect, that the testimony showed that the United States Telegraph Company and the Western Union Telegraph Company had become lawfully consolidated under the laws of New York, prior to October 1, 1866, and that the latter company was the legal successor of the former. He was of the opinion, however, that the privilege conferred upon the United States Telegraph Company by the fourth section of the act of July 2, 1864, supra, was so strictly personal that it was lost by the consolidation proceedings, and did not pass to the consolidated company. In all other respects the circuit court appears to have fully concurred in the points ruled by Mr. Justice Miller, and in similar rulings made by Judge McCrary in the same case. Vide 3 Fed. 423, 425. The question that we have to decide, therefore, with respect to the contract of 1866, (and, in view of former decisions, the only question that we deem it necessary to consider,) is whether the privilege granted to the

United States Telegraph Company by the act of July 2, 1864, was purely personal, and was lost by its merger with the Western Union Telegraph Company. With reference to that question it may be conceded to be a well-settled rule, resting upon sound reasons, that, when a franchise has been granted to a quasi public corporation in consideration of public benefits that may result from its exercise, such franchise cannot be bodily assigned by the grantee company unless the power of assignment is conferred in express terms or by fair implication. Such franchises are properly said to be personal in their nature, and not assignable. But when a corporation is endowed with a privilege or power like the one now in question, and the corporation is one which, under the the law of its creation, has the right to consolidate with other corporations engaged in a like business, it may well be doubted whether the rule above conceded has any application. In such cases it must be presumed that the privilege was conferred with full knowledge of all the charter powers of the grantee, and it is a reasonable inference, unless some restrictive words are employed, that the legislature intended that the privilege conferred should pass to, and become vested in, the consolidated company, if one was subsequently formed. In the present case, however, it is not necessary for the Western Union Telegraph Company to rest its right to enter into the aforesaid arrangement with the Kansas Pacific Railway Company upon the ground last stated, however tenable that ground may appear to be, for the act of July 2, 1864, bears upon its face indubitable evidence that congress did not intend that the right to enter into such an arrangement should be exercised solely by the United States Telegraph Company. The first section of that act granted the right to construct a line of telegraph between the Missouri river and San Francisco to "the United States Telegraph Company and their associates." That was the important franchise which the act conferred, and other privileges mentioned in succeeding sections were incidental and supplementary; in other words, they were conferred to furnish an inducement to the telegraph company and its associates, and to enable them, to accomplish the work authorized by the first section, which the government was desirous of fostering. In view of the language employed in the first paragraph of the act, which clearly authorized and encouraged other corporations to become associated with the United States Telegraph Company, and to embark their means in what was then considered a great and hazardous enterprise, it cannot be consistently maintained that congress intended that the privilege of entering into the arrangement mentioned in the fourth section of the act should be confined solely to the United States Telegraph Company, and that it should not inure to the benefit of its associates. We think it is far more reasonable to suppose that congress intended that the privilege in question should be shared by any corporation which became lawfully associated with the United States Telegraph Company in the work of constructing a transcontinental line, and more especially that the privilege should inhere in a corporation with which the

United States Telegraph Company became lawfully united by the process of consolidation.

In opposition to the views last expressed, it is urged by the government that when the act of July 2, 1864, was passed, congress knew that a line of telegraph had already been constructed across the plains, by other telegraph companies, about on the proposed route of the main line of the Union Pacific Railroad; that by the last-named act it intended to aid in the construction of an independent and competing line of telegraph; and that this purpose will be defeated unless it is held that the privilege granted to the United States Telegraph Company to enter into an arrangement with the Kansas Pacific Railway Company was strictly a personal privilege accorded to the the former company. It is to be observed, however, that the act now under consideration says nothing about competing lines of telegraph, but is entitled "An act for increased facilities of telegraphic communication between the Atlantic and Pacific States. * * *" Such additional facilities would be obtained by the construction of a new line on a new route, and congress undoubtedly contemplated that such a line would be built, and such a line was in fact constructed. We fail to see, therefore, how the purpose which congress saw fit to express in the title of the act will be defeated by conceding that the privilege mentioned in the fourth section of the act was not strictly personal, but was a grant to the United States Telegraph Company "and its associates." It might happen, of course, that by a process of consolidation the two companies would fall under one management; but even in that event the two lines of telegraph, if erected, would afford increased facilities for communication. Moreover, if the idea of exciting competition by the construction of a second line of telegraph across the continent was at that time entertained by congress, (which we very much doubt,) it was evidently well known to congress that a practical identity of interest and control could be effectually secured by other means than by a consolidation of property and franchises, and it took no precautions to prevent such a merger. We must conclude, therefore, that the considerations last mentioned are entitled to little weight in determining whether the privilege in question became vested in the Western Union Telegraph Company. An attempt is also made, in behalf of the government, to deduce evidence, from certain reports made by the Kansas Pacific Railway Company to the United States, that the line of telegraph along that railway, from the Missouri river to Denver, was in fact built by the railway company at its own expense, in fulfillment of its charter obligations; but an obvious answer to this suggestion is that no statement made by the officers of the railway company can prejudice the rights of the telegraph company. For other reasons, however, the suggestion is without merit. We have no doubt, under the testimony, that the line of telegraph along the Kansas Pacific Railway was built substantially in accordance with the arrangement embodied in the contract of October 1, 1866. To enable the railway company to obtain its subsidy it was no doubt required

to prove, to the satisfaction of the officers of the government, that a telegraph line, as well as a railroad, had been constructed. The United States was entitled to insist upon such proof because the obligation of the railway company to construct a telegraph would not be fulfilled merely by entering into an "arrangement" with some telegraph company to construct such a line. It was bound to see that the arrangement was carried out, and that a line was, erected along its right of way, either by the telegraph company alone, or by itself and the telegraph company, under some satisfactory agreement as to dividing the expense, which telegraph line would be fairly adequate for governmental and commercial purposes; but it certainly was not necessary for the railway company to set forth in its reports to the government the precise terms of its arrangement with the telegraph company, or the precise sum which it had itself contributed towards the construction of the line. For these reasons we cannot attach much importance to such reports,—certainly not enough to decide that the line was not built under an arrangement with the telegraph company. The result is that with respect to this feature of the case we feel constrained to concur in the view. entertained by Mr. Justice Miller,—that the contract of October 1, 1866, was a valid agreement, and that it was within the purview of the act of July 2, 1864.

This opinion has necessarily been extended to such length in the discussion of the foregoing questions that we have felt compelled to dispose of the remaining questions as briefly as possible, although we have considered them attentively, and with a due appreciation of their importance. The fourth section of the act of August 7, 1888, under which this bill purports to have been filed, provides, in effect, "that in order to secure and preserve to the United States the full value and benefit of its liens upon all the telegraph lines * * * constructed by and lawfully belonging to said railroad and telegraph companies referred to in the first section of this act [being those mentioned in the Pacific Railroad acts] and to have the same possessed, used and operated, in conformity. with the provisions of this act and of the several acts to which this act is supplementary—it is * * * made the duty of the attorney general * * * by proper proceedings, to prevent any unlawful interference with the rights and equities of the United States * * * to have legally ascertained and * * * adjudicated all alleged rights of all persons and corporations * * * claiming * * * any control or interest * * * in any telegraph lines or property, or exclusive rights of way upon the lands of said railroad companies, * * * and to have all contracts and provisions of contracts set aside, * * * which have been unlawfully and beyond their powers entered into by said railroad or telegraph companies. * * *" We must presume in this case, as in all others, that, when congress authorizes the attorney general to take any legal proceedings to enforce the rights of the United States, it is intended, unless the contrary idea is clearly expressed, that rights of a purely legal nature, for the enforcement of which there is an adequate legal remedy, shall be so enforced by a proceeding at law rather

than by a suit in equity. We cannot assume, therefore, there being no clear expression of such a purpose, that congress intended by the fourth section of the act of August 7, 1888, to authorize matters of legal and equitable cognizance to be mingled indiscriminately in the same complaint, and that all the rights and duties mentioned in said act, of whatsoever nature, should be enforced in a single suit, to be instituted by the attorney general in the name of the United States. Even if congress has power to so direct, we should not feel authorized to say that it has done so, without a positive declaration of such purpose, which we do not find in the statute now in question. Some of the duties imposed by the act of August 7, 1888, which the government apparently seeks to enforce in this suit, are evidently of such a nature that they may be adequately enforced at law. Among these may be mentioned the duty enjoined upon the Union Pacific Railway Company, by the first section of the act, of operating "by itself alone, through its own corporate officers, its telegraph lines." We know of no reason why this precise duty may not, and should not, be enforced by mandamus, if it has in fact been violated. U. S. v. Union Pac. R. Co., 98 U. S. 569, 609; Attorney General v. Utica Ins. Co., 2 Johns. Ch. 371. Acting in accordance with the views last stated, we have not considered it our duty in this case to inquire, and we do not determine, whether the railway company's present method of operating its line of telegraph is in violation of the first section of the act of August 7, 1888. It is shown by the record that since the passage of that act the parties to the contract of 1881 have by mutual consent rescinded the twelfth clause of the agreement, which provided for the employment of a joint superintendent of the telegraph line. Whether the existing method of operating the line should be altered in any other respect to keep within the requirements of the late statute in the respect last stated we leave to be determined in an appropriate proceeding brought for that purpose. In this connection we may also add that it is the opinion of this court that the duty enjoined by the second section of the act of August 7, 1888, with reference to affording equal facilities to all connecting lines of telegraph, without discrimination against any, is a duty which should be enforced in the mode prescribed by the third section of the act, rather than by a bill in equity. The second section imposed a duty upon the railway company which was in some respects new, and provided a special remedy for its enforcement. Under these circumstances, we think that the remedy thus provided should be regarded as exclusive. But, even if the latter view is erroneous, we still think it manifest that the record does not make out a case which would authorize us to enter any order or decree based on the "equal facilities" provision of the second section of the act. The proof does not show, with any certainty, that since the passage of the act any telegraph company has placed itself in a position to demand of the railway company the same facilities which it accords to the Western Union Telegraph Company, and that its demand has been refused. No telegraph

company is complaining before us that, having accepted the provisions of title 65 of the Revised Statutes, and having extended its lines to a connection with the stations of the railway company, and having solicited the same facilities which the Western Union Telegraph Company now enjoys, it has been denied such privileges. Until such a case has been presented, both by complaint and by proof, we cannot presume that the railway company intends to disregard its duty, and it surely cannot be expected of us that we will attempt to give an additional sanction to the statute by merely repeating its mandate. In other respects, however, the case, as presented by the record, is one which entitles the complainant to a certain measure of equitable relief under the provisions of the act on which the suit is based. The bill shows that the government has a lien upon the railroad and telegraph lines to which the litigation relates, and, as such lienholder, it is undoubtedly entitled to have its rights and equities in and to the telegraph property along the right of way of the Union Pacific Railway Company judicially ascertained, and to have the rights of other persons and corporations therein also ascertained and adjudicated. Incidental to that relief is the right to have all provisions of contracts set aside and annulled that are unlawful, and that in any manner impair the security of the United States, or cloud its title or prejudice its rights. It is the appropriate function of a court of equity to administer such relief, and the act of August 7, 1888, directs the attorney general to inaugurate such a proceeding. We are of the opinion, therefore, that it was the duty of the circuit court, under the evidence laid before it, to have treated the suit as a bill filed to obtain the relief which we have generally indicated in the last paragraph, and to have decreed accordingly. In point of fact it went much further than the act of August 7, 1888, seems to us to have warranted in an equitable proceeding of this nature, and incorporated some provisions in its decree which we feel constrained to disapprove. We shall not stop, at this time, to enumerate all of the provisions of the decree of the circuit court that have thus met with our disapproval. It will suffice to say that the order canceling the contracts of July 1, 1881, and October 1, 1866, was the most important error. The government was in no position to ask that the contract of July 1, 1881, should be annulled in toto, merely because some of its provisions, though valid when made, had been rendered invalid by a subsequent statute. It was only entitled to have those provisions declared inoperative and no longer obligatory, so far as they were in conflict with the subsequent enactment. The case must accordingly be reversed, and the cause remanded, with directions to the circuit court to set aside its former decree, and, in lieu thereof, to make and enter a modified decree, consistent with this opinion, the provisions whereof we will now proceed to outline.

The decree to be entered by the circuit court pursuant to the mandate of this court should order, adjudge, and decree:

First. That the agreement named in the bill of complaint, entered into on the 1st day of October, 1866, by and between the

Union Pacific Railway Company, Eastern Division, and the Western Union Telegraph Company, was lawfully entered into by the parties thereto, and constituted a valid and binding contract.   Second. That said contract of October 1, 1866, continued in full force and effect until the 1st day of July, 1881, when, by agreement of the parties thereto, its provisions were superseded by the provisions of the contract of that date, entered into by and between the Union Pacific Railway Company and the Western Union Telegraph Company. Third. That the agreements entered into on the 1st day of September, 1869, and on the 14th day of December, 1871, by and between the Atlantic & Pacific Telegraph Company and the Union Pacific Railroad Company were entered into by the Union Pacific Railroad Company unlawfully and beyond its powers, and the said contracts, and each of them, are hereby canceled, annulled, and held for naught.   Fourth. That the equities arising out of the said contracts of September 1, 1869, and December 14, 1871, were adjusted and settled by all the parties interested therein in the making of the contract of July 1, 1881, by and between the Union Pacific Railway Company and the Western Union Telegraph Company.   Fifth. That the contract of July 1, 1881, named in the bill of complaint, entered into by and between the Union Pacific Railway Company and the Western Union Telegraph Company, was lawfully entered into by the Union Pacific Railway Company and the Western Union Telegraph Company, and constituted, when made, a valid and binding contract by and between the parties thereto.   Sixth. That the third and fourth paragraphs of the contract of July 1, 1881, in so far as they grant, or were intended to grant, exclusive rights or privileges of any character, are repugnant to the act of congress approved August 7, 1888, entitled "An act supplementary to the act of July first, eighteen hundred and sixty-two, entitled 'An act to aid in the construction of a railroad and telegraph line from the Missouri river to the Pacific ocean, and to secure to the government the use of the same for postal, military and other purposes,' and also of the act of July second, eighteen hundred and sixty-four, and other acts amendatory of said first-named act;" and said paragraphs of said contract are hereby adjudged and declared to be null and void, and are hereafter to have no force or effect, to the extent, and only to the extent, that they secure or grant to the Western Union Telegraph Company, or were intended to secure to it, any exclusive rights, privileges, or advantages whatsoever. Said third and fourth paragraphs are as follows, to wit:  *  *  *. Seventh. That there is a single line of poles between Council Bluffs and Ogden, on the right of way of the defendant railway company, which poles were erected in accordance with the provisions of the contract of July 1, 1881, at the joint and equal expense of the defendant railway company and the defendant telegraph company, and is the property of said companies jointly; that upon said poles, between Council Bluffs and Ogden, there are two distinct lines of telegraph, the wires of one of which said lines are owned solely by the said railway company, and the wires of the other of which are owned solely by the said telegraph company; that the line of tele-

graph poles on the Kansas Pacific Railway, from Kansas City to Denver, was originally erected as provided in the contract of October 1, 1866; that said line of poles between Kansas City and Denver, since the 1st day of July, 1881, has been reconstructed under and in accordance with the provisions of said last-named contract, and said line of poles thus reconstructed bears two distinct lines of telegraph, one of which is the sole property of the defendant railway company, and the other of which is the sole property of the defendant telegraph company; that there are two distinct lines of telegraph on the line of poles between Denver and Cheyenne, one of which is the sole property of the defendant railway company, and the other of which is the sole property of the defendant telegraph company. Eighth. That all of the foregoing lines of telegraph of the defendants herein are, in accordance with the provisions of the contract of July 1, 1881, worked by batteries furnished by the defendant telegraph company, and operated by instruments the property of the defendant telegraph company. Ninth. It is further ordered, adjudged, and decreed that the defendants hereto are allowed the period of 60 days after the entry of this decree to make such arrangements, adjustments, and changes as are rendered necessary by the annulling of the aforesaid provisions of the contract of July 1, 1881, and to carry out the provisions of this decree.